981. DeVANE *v.* ATLANTA, BIRMINGHAM AND ATLAN-
TIC RAILROAD COMPANY.

1. The relation of carrier and passenger arises only from a contract, express or implied. One who gets on the train of one railway company, mistaking it for that of another road, and, discovering his mistake after the cars are in motion, attempts to alight, but, finding while he is on the bottom step that the train is running too fast, changes his mind and decides to pay his fare to the next station, is not, while thus on the car steps, a passenger.

2. A railway company is liable to a trespasser on its train only for intentional (that is to say, wilful or wanton) injuries inflicted upon him. Before a failure to exercise ordinary care toward him can become actionable, the circumstances must be such as to characterize that failure with wilfulness or wantonness.

3. While proof may be received that a person alleged to be a member of a train crew wore a cap and a uniform of the kind such employees generally wear, as a circumstance to show that he belonged to that class, still the law raises no conclusive presumption that such is the case.

4. There was no error in refusing a new trial on the ground of newly discovered testimony.

5. In an attempt to impeach the fairness or impartiality of a juror, the finding of the judge as trior, on disputed facts, is final.

Action for damages, from city court of Cordele—Judge Strozier. December 16, 1907.

Argued March 11,—Decided March 30, 1908.

According to the plaintiff's contentions, he got on the passenger-train of the defendant, at the union station in Cordele, mistaking it for the train of another company, upon which he desired to become a passenger. Soon after the cars began to move, he discovered

that he was on the wrong train, and sought to alight. Getting down on the car-step, he decided that the train was moving too rapidly, and started to go back inside, with the intention of paying his fare to the next station; and as he was thus standing on the lowest step and was about to remount the coach by pulling upon the platform rail, a negro porter wantonly and in gross negligence jerked his hands loose, causing him to fall under the train, whereby both his feet were run over and so mangled as to require amputation. The contention of the defendant was, that the plaintiff, being drunk, merely swung upon the car rail, intending to ride from one street-crossing to another, and, losing his hold, fell under the car; that if any one caught his hand, it was not an employee of the company; that the only colored employee on the train was the porter, and he was in the baggage car at the time, sorting and arranging trunks, under the direction of the baggage-master. This negro porter died prior to the trial, and the plaintiff was not allowed to testify as to the alleged transaction with him. A disinterested witness testified, that a negro, in cap and uniform, caught the plaintiff's hand just before he fell, and while he was swinging with one foot on the step and one off, but he could not say whether this negro was trying to push him off or to help him on. The jury found for the defendant, and the plaintiff moved for a new trial, on many grounds; and his motion having been overruled, he brings error.

*J. T. Hill,* for plaintiff.

*Rosser & Brandon, Crum & Jones,* for defendant.

POWELL, J. . (After stating the foregoing facts.)

1. The plaintiff's highest claim is that he was a passenger because, although he was originally an innocent trespasser on the cars, he changed his mind when he was in the act of dismounting, and decided to remain upon the train and pay his way to the next station, and the relation of carrier and passenger thus arose, and the railway company immediately became chargeable with the duty of exercising toward him extraordinary care and diligence. No consent of the carrier to receive the passenger in such a manner can be implied, nor does the law impose any such duty. The relation of carrier and passenger exists only from a contract, express or implied. This position of the plaintiff is therefore wholly untenable. Compare *Central Railroad* v. *Perry,* 58 *Ga.* 461, 469 (5);

*Georgia Ry. & Elec. Co.* v. *Cole,* 1 *Ga. App.* 33 (57 S. E. 1026);
*Southern Ry. Co.* v. *Rosenheim,* 1 *Ga. App.* 766, 769 (58 S. E. 81).

2. Complaint is made 'of several charges of the court, in each
of which the jury was, in substance, instructed, that if the plain-
tiff was not a passenger, but was a trespasser upon 'the train, the
defendant would not be liable, unless the casualty was produced by
some wilful or wanton act of one of the defendant's employees;
that the only duty owing to him by the railway company, under
these circumstances, was not to wilfully or wantonly injure him.
It is said that the jury should have been instructed that while
primarily the only duty to a trespasser is not wilfully or wantonly
to injure him, nevertheless, after his presence is known, a failure
on the part of the defendant and its employees to exercise ordinary
care and diligence to prevent his being injured is actionable. This
case is a very fair illustration of what we said in *Charleston Rail-
way Co.* v. *Johnson,* 1 *Ga. App.* 441 (57 S. E. 1064), that in cases
of injuries to trespassers, the elemental concept is of a liability only
for wanton or wilful injury; that, since a failure to exercise ordinary
care to prevent injuring a person seen and known to be in a position
of peril is so seldom distinguishable from wantonness, in many
cases the failure to exercise that degree of care toward the imper-
iled trespasser is held to create a liability; but that "unless the
circumstances are such that the failure to exercise ordinary care
and diligence is at least tinged with wantonness or wilfulness,
there can be no recovery by the trespasser." Let us suppose that
in the case at bar the negro porter found the defendant hanging
perilously from the car rail, trying to mount the step, and that with
the common instincts of humanity he rushed to his assistance, but
that despite his good intentions he did not use all the skill and
judgment which an ordinarily prudent man would have used
in extricating the trespasser from his imminent peril, and that
the injury thus resulted; will any fair-minded man say that this
failure of the porter to exercise ordinary care, under such circum-
stances, is in any sense the juridic or legal equivalent of that wilful-
ness or wantonness which is primarily the basis of liability in cases
of injuries to trespassers? Can it be said, under the common
law—that system of principles perfected by human reasoning and
so ancient of recognition that the memory of man runneth not to
the contrary (for the doctrine we are now discussing remounts to

that source and is not a creature of statute),—that an employer. can be held liable to one who, by his own wrong, has put himself in a position of peril, because an employee, who happens to see the situation and generously tenders his assistance, fails, either from unintentional carelessness or through-personal incapacity (and we must remember that as to adults the law measures ordinary care and diligence by a standard prudent person, and not by the particular capacity of the individual whose conduct is in question), to do each and every thing which an ordinarily prudent man would have done under the circumstances? The untenability of the proposition is emphasized if we accept, as the law in such cases, the doctrine given recognition in the case of *Allen* v. *Hixson,* 111 *Ga.* 460 (2), (36 S. E. 810), that the duty of releasing a hapless victim from a painful or dangerous situation, brought about by accident or his own fault, is one of humanity only, and creates no legal liability in its breach; for the proposition thus developed means that the porter in this case might have passed by and left the plaintiff to drag from the car rail without creating a liability on his employer, but, since he offered help, his master is to be held responsible unless the assistance was of the quality and quantity that the law's paragon of ordinary prudence would have given. Shall the Levite and the priest, who passed by, go scot free, while the Good Samaritan, who poured oil and wine into the wounds when an ordinarily prudent person might have used some other remedy, be mulcted in damages?

The pains we have taken to make a reductio ad absurdum of the proposition under discussion have not been provoked so much by the present case as by the confusion that has arisen, with no little possibility of perpetuation, from the fact that in this and in some of the other States there are a number of reported cases in which liability to a trespasser has been sustained on the declared reason that the defendant, aware of the plaintiff's being in a position of imminent peril, breached a duty owing him, by not exercising ordinary care and diligence to avoid doing him injury; and these precedents give color to the assertion of a general rule in which ordinary care and diligence, in the usual meaning of that expression, is of controlling importance. Specifically applied to their facts, these cases, or most of them, are sound; for they involve no violation of the true rule that the fundamental duty of the property

owner to the trespasser is not to injure him wilfully or wantonly.
If the owner of the property or the proprietor of the dangerous
agency by which the trespasser is imperiled, seeing the danger and
realizing the situation and being able, by the exercise of ordinary
care, to avert the casualty, in disregard of the impulses of humanity
perpetuates or increases the danger, as where a locomotive engineer,
seeing a trespasser helpless on the track ahead of him, lets the
train run on over him when he could stop it, the failure to exercise
ordinary care to prevent the injury is the immediate cause of it;
and that particular dereliction may justly be the basis of the court's
judgment sustaining a liability in damages; but not for the reason
that the defendant owed the injured trespasser the general duty
of maintaining ordinary care and diligence for his safety, but be-
cause the failure to exercise ordinary care was, under the circum-
stances, wilful, or at least wanton. But these precedents can not
be extended, to the full scope of all they seem to say, to other
cases, where the facts are different and the failure in care is not
wilful or wanton, without doing much injustice. While maturer
reasoning has brought the minds of most of us to the rejection of
the notion of a deodand being necessary for the expiation of blood
haplessly shed, few of us can view or contemplate a human body
maimed or fatally injured by some great machine without feeling
that somehow or in some way the owner of the instrumentality by
which the harm was done should do something to redress the injury,
irrespective of where the actual fault may lie; nevertheless, no mat-
ter how deeply this feeling may be instilled, we are sure that any
intelligent man who will stop for a moment's thought will concede
that ordinarily a trespasser, one whose own fault or wrong has put
him where he ought not to be, one whose own volition or careless-
ness has put him in range of a danger to which he need not have
exposed himself, ought not to have the right to demand of the
owner of the premises or property, upon which he has come with-
out license or invitation, compensation for any injuries he may re-
ceive from instrumentalities operated by the owner or proprietor
in the legitimate course of his own business; and that the ancient
rule which gives the trespasser cause of action only when the
owner has hurt him intentionally—that is to say, through wilful-
ness, which is actual intent, or through wantonness, which is a con-
structive intent implied by the law from recklessness—is inher-

ently just. Even under the old-time superstition alluded to above, the victim of self-imposed perils received no compensation, for the deodand went to the use of God or the king.

3. The plaintiff claimed that the negro porter in the employment of the defendant pushed him off; the defendant contended that if any negro pushed him off it was not the porter. Exception is taken to the following excerpt from the charge on that subject: "I charge you that if you believe, from the evidence, that some negro pushed the plaintiff from the train, and that such negro did wear a uniform and cap, there could be no recovery unless such negro was not only in the employ of the defendant, but was in fact engaged in some capacity on the train at the time the accident occurred;" the principal ground of objection being that if the negro was on the train, wearing a cap and uniform, there would be a presumption that he was an employee of the company, engaged in some duty on that train. While the identity of a conductor or other trainman may be shown circumstantially, and the wearing of the usual dress of employees may be considered as one of the circumstances (see *Coursey* v. *So. Ry. Co.*, 113 *Ga.* 297, 300 (38 S. E. 866), s. c. 115 *Ga.* 602, 604 (41 S. E. 1013)), yet the actual fact of whether the particular person is or is not an employee is after all an open one, for the determination of the jury. There is no such rule of law as that a person on a train in cap and uniform, even though it be the regulation cap and uniform worn by employees of the railway company, is conclusively presumed to be such an employee.

4. A new trial is asked also on the ground of newly discovered testimony. We were struck by the language in which Mr. Rosser, of counsel for the defendant in error, characterized such grounds for new trial. To quote him: "I was about to say that they are usually the last wail of a party in articulo mortis; but not so; it is merely a voice crying from the tomb, praying for resurrection." We ourselves have been led by our observation to believe that such grounds are too frequently the result of post mortem diligence. In the present instance the new testimony is only cumulative, and not of such a nature as to satisfy the trial judge that a new hearing would likely further the ends of justice. The trial judge has a broad discretion in such matters, and his decision thereon will not be lightly disturbed.

5. There was also an attempt to impeach the fairness and im-

partiality of one of the jurors. The testimony was conflicting, and the judge, acting as trior, found against the attack. This is final. *Moore* v. *State,* 1 *Ga. App.* 728 (57 S. E. 956).

After a full review of the whole record, we are of the opinion that a fair and impartial trial, free from substantial error, has been had, and the judgment is therefore                    *Affirmed.*