SMITH *v.* THE SAVANNAH, FLORIDA AND WESTERN RAIL-
WAY COMPANY.

1. Where, according to the weight of the evidence, there is grave doubt whether the plaintiff ought to recover anything, the court below is warranted in granting a new trial, even a second new trial, if the damages found by the jury are extreme or excessive.
2. After waiting a reasonable time for cars blocking the highway to be removed, a pedestrian may turn aside to avoid the obstruction and pass over the company's enclosed grounds. In so doing he will be no trespasser.
3. Whilst upon the company's grounds under such circumstances, the diligence for his safety due from the company, as well as his own diligence in guarding against danger, is for determination by the jury. If the jury think his presence ought to have been foreseen or anticipated, ignorance of it would make no difference.
4. Particular means or measures of diligence appropriate for use by each party should be left to the jury.

March 19, 1890.

Damages. New trial. Negligence. Railroads. Practice. Before Judge FALLIGANT. Chatham superior court. June term, 1889.

On January 13, 1888, Joe Smith, nine years and eight months of age, returning from school about two o'clock in the afternoon, was run over by the defendant's train and lost a leg. He brought suit and recovered a verdict for $7,500 damages. Judge Adams granted a new trial, upon which the evidence for the plaintiff was to the following effect; He lived just out of Savannah on Reynolds street, 350 or 400 yards south of Lover's lane and east of the right of way of the defendant, which, going southward, crosses Lover's lane, which runs eastward from the city and is a continuation of Anderson street, which runs east nearly to the corporate limits. The railway crossing over Lover's lane is on the corporation line. Plaintiff had for three years been going to school in the city on Habersham street, which runs north and south and crosses Anderson street. His way

home was, first to Anderson, thence east to and across the railway tracks as they cross Lover's lane, and after reaching Reynold's street turning south to his home. He was under standing orders from his father (who was very strict with him) to go home immediately after school was dismissed, which usually was about half past one o'clock. He was generally obedient and gave his father no unusual trouble; but on the day in question he stopped after school to witness a rooster-fight, which delayed him for perhaps half an hour. When he reached Lover's lane crossing, passage over it was blocked by a string of cars standing on the centre track. There were two other tracks, one on each side of the centre or main one. Some distance to the south was a switch connecting the main track with the one east of it. The plaintiff paused a few minutes on reaching the crossing and finding it blocked, but being in a hurry to get home and fearing he would get a whipping for being late, he went round the south end of the train that was standing on the centre track to get to the other side of the crossing, attempting to cross the east track also. Standing on this east track just south of Lover's lane were two cars uncoupled from each other; they had been there three or four weeks. Plaintiff was crossing the east track south of them when he was suddenly struck and run over by the last car of defendant's train which, with the engine on its south end, was being backed upon the east track from the centre one. He did not see or hear it until it was within about a foot of him, "coming fast"; tried to avoid it but failed. He was within a foot or two of the south end of the two stationary cars, and the same car that struck him immediately afterwards struck the stationary cars quite hard. The boy himself testified that there was an engine attached to the cars standing on the centre track, which was making so much noise that he did not hear

the approach of the train that struck him; his attention had been engaged on the standing train around which he had gone, not on the one which struck him; he was not expecting that. His parents had previously told him not to walk on the tracks; that if a train blocked the crossing, to wait until it pulled out before he crossed. He knew that it was wrong and dangerous to walk on the tracks instead of waiting for a train to pass. But when he went around the train on the centre track, he thought he would succeed in getting over all right. A man who was driving a wagon was stopped for five or six minutes, upon arrival at the crossing, by the cars standing across it. He heard the cars coming "pretty lively," and heard them bump together, and the boy scream, about the same time. He alighted, crossed the cattle-guard next to the west track, ran thirty-five or forty yards down the right of way to the boy, found him on the cross-ties of the centre track, picked him up and carried him through an opening in defendant's wire fence which ran parallel and east of its tracks, and thence across a field to his home; the train which did the injury having, in the meantime, been coupled to one of the stationary cars and gone back some distance southward. Plaintiff told this man as soon as he reached him, in response to his questions, that he was going across the track to go home over a little path which he showed and which went towards his home, four or five hundred yards off. This man waved to the men on the engine, and to one (probably one of the two switchmen) who gave signals, but they paid no attention to him. No bell was rung or other signal given of the approach of the train that did the injury. The vicinity of the crossing was considerably built up and inhabited; and the crossing was in extensive use. The plaintiff was laid up for two months before he could be taken out in a vehicle, and suffered extremely. His leg

was amputated above the knee on the same afternoon it was crushed; and in about three weeks another operation had to be performed, cutting off a piece of bone which protruded. His physician expected him to die; paid him seventy or eighty visits, daily and semi-daily. When he was struck he was crossing the track directly. The bumper of the car hit him and knocked him slant-wise. The man already referred to who came to his assistance, was the first one who reached him. One Mrs. Brown came very soon after him. The Carlisle tables in 70 *Ga.* were introduced.

The defendant's evidence tended to show the following: The engine and train of twenty-five cars came from the wharf southward, on the centre track, and without stopping, crossed Lover's lane entirely, the last car being, when they did stop, one or two car-lengths south of the first switch south of Lover's lane. The only other cars around there besides this train, were the two stationary cars about 70 yards south of Lover's lane on the east track, cut loose from each other; and the train backed northward to couple to them, starting while the engine was within less than 400 yards from the crossing. The train-men did not intend to run back over the crossing until they had made the coupling; and as they came back slowly (three or four miles an hour), the bell was ringing all the time. They meant, after coupling, to run on the other side of Lover's lane and leave these cars there. The engineer felt no jar as the first stationary car was struck. The coupling to it was made with a stick by the switchman standing between the main and east tracks. He testified that he first saw the boy just then, falling from the back of the other stationary car towards the main track, but did not have time to go to him then. It seems that the boy was not otherwise seen by any of the train-men except as he was being borne away. The stationary car far-

thest north rolled to the crossing and stopped there, the track-grade towards it being downward. Because of the crowd that immediately gathered on the east track, the train could not be put there lest some of the persons would be hurt; and as it was about time for the out-going passenger-train to come by, it having the right to the centre track unobstructed, and the freight-train no right to be there, the men were in some hurry to get out of its way, and so the train was again pulled south-ward and backed upon the west track. The passenger-train then passed, after which the engine of the freight-train in question went again upon the centre track and thence upon the east track and pulled the stationary car away from the crossing so that people could pass. The boy was 70 or 75 yards south of the crossing when hurt. The next public crossing north is about 500 yards from Lover's lane; the one next south is about three quarters of a mile therefrom. The track is curved in this vicinity. Mrs. Brown, who lived near by, was the first to reach the plaintiff after he was run over. She first saw him through a crack in her fence; then went up stairs to tell the man who was walking away with a pole (probably the switchman) to take up the boy, who, seeing that they would not hear her, called her, and she went to him as quickly as possible, followed by the man who had been in the wagon. Both of them, aided by a colored man, carried the boy home, passing him over the wire fence. There is a good path running in the same direction with the tracks on the east side of them, between them and the wire fence and south of the crossing; and it is in common use by pedestrians. There are cattle-guards next to the tracks and just south of the crossing; they can be crossed by boys and men stepping over them from one timber to the next. The wire fences are five feet high, with three strands of barbed wire about a foot apart, and with a board at the

top, and extended southward on both sides of the right of way for over half a mile. The plaintiff's school was dismissed that day about the usual time. If he had gone directly home, he would probably have passed the crossing before the arrival of the train which injured him; one of his schoolmates did so.

The jury found for the plaintiff $10,500. The defendant moved for a new trial on the grounds, among others, that the verdict was contrary to law and evidence, and excessive; and because the court erred in refusing to charge thus:

(a) "If the jury find that a blocking of the crossing was not the real cause of Joe Smith's being injured, and that the employés of the company did not know that he had gone on its road-bed south of Lover's lane until after he was injured, then the verdict will be for the defendant."

(b) "If the jury find that it was not the intention of the engineer to run his train across Lover's lane, but to go back and couple on two cars on the east track before crossing Lover's lane, then whether or not the bell was rung is immaterial, as the defendant was not bound to give any warning by ringing the bell while the train was running on the road-bed of the company without any intention of crossing Lover's lane."

(c) "If the jury find that Joe Smith went across the cattle-guard and went upon the right of way of the railway company, that such right of way was enclosed by a fence on either side, which fence ran southward for the distance of one half mile or more before it reached a public crossing, then Joe Smith was a trespasser. While this would not authorize the defendant wantonly or intentionally to injure the person of Joe Smith, still the defendant would only be bound to use all ordinary care and diligence to keep from injuring his person after it was discovered by the employés of

the defendant that Joe Smith had crossed the cattle-guard and was in a position of danger on the road-bed of the defendant."

The motion was sustained, and the plaintiff excepted.

DENMARK & ADAMS, for plaintiff.

CHISHOLM & ERWIN, for defendant.

BLECKLEY, Chief Justice.

1. Although this was the second grant of a new trial, we would be disposed to uphold it if it rested alone upon the ground that the damages found by the jury are excessive. The case is an exceedingly close one for any recovery at all, and this being so, there ought to be no extravagance or excess in the amount of damages which the company shall pay. Although the plaintiff was under ten years of age, he seems to have been a bright boy, having enough development of mind to know that he was doing wrong not to wait for the cars to get out of his way at the crossing, and in passing over the tracks in the company's switching yard, where he was injured. Not only his capacity to know, but the actual state of his knowledge, was shown by his testimony in so far as the evidence given by a child can manifest the operations of his own mind.

2. As there is to be a new trial, we will briefly indicate our views of the law of the case upon the material questions which were discussed by counsel in the argument. The company had no right whatever to obstruct the highway for any length of time. But the occupation of its track by moving cars in the due course of business would be no obstruction. Nor would the mere casual stopping of the train, or the cars, upon the crossing amount to an obstruction, if they were not suffered to remain a needless or unreasonable length of time. But for them to stand upon the track so as to hinder the use of the highway needlessly or unreason-

ably, would be an obstruction.  And after the plaintiff had waited a reasonable time for the crossing to be opened, and it was not done, he had a right, if his occasion to go home was urgent, to deviate from the highway and if necessary pass round the obstruction over the company's enclosed premises.  In so doing, he would not be a trespasser, but would be in the exercise of a public right as a passenger upon the highway suddenly hindered from proceeding by coming in contact with a public nuisance on his route.  Angell on Highways, §353 *et seq.*; Campbell v. Race, 7 Cush. 408, s. c. 54 Am. Dec. 728, and notes ; *Branan v. May*, 17 *Ga.* 136.  With these authorities Jackson *v.* Nashville, etc. R. R., 13 Lea, 491, may possibly be reconciled, but if not, they seem to us correct nevertheless.

3.  Supposing the plaintiff to be justified in leaving the highway and passing through the company's grounds, he would be entitled to such diligence from the company's servants using these grounds at the time as the circumstances would render reasonable and practicable.  We think it was properly left to the jury to determine what acts of diligence on their part were appropriate.  Although the servants did not know of his presence, yet, if he was driven from the highway by an obstruction placed and left there by the company, the jury might conclude that they or the company should have anticipated his presence.  The reasonableness of such anticipation would be a question for the jury under all the circumstances ; and if in their opinion his presence should have been foreseen as probable, the rule of diligence would have been the same as if it had been actually known.  If, on the contrary, it would be unreasonable to expect that this route would be taken by any one stopped or delayed by the obstruction, then the plaintiff would be entitled to no more diligence than was usually exercised at that place in switching and

v 84-45

handling trains or cars, as the company's servants were doing on this occasion. Nor would mere negligence on the part of the servants subject the company to liability, unless the plaintiff exercised due care on his part, considering his age, intelligence and the facts surrounding him, to avoid being injured; that is, if the exercise of such care would have prevented the injury.

4. The particular means or measures of precaution which either party should have used under the circumstances would be for determination by the jury. For instance, if ordinary and reasonable diligence required ringing the bell on the engine whilst the train was backing, the bell should have been rung. And if the plaintiff was sufficiently intelligent, heedful, and conscious of danger to make it incumbent upon him to look and listen, he should have done his part in this respect, in so far as was reasonable.

The charge of the court was in substantial conformity with the views which we entertain and have expressed, and we think there was no error in refusing to give in charge any of the requests which the court declined. The grant of a new trial, however, we approve and fully endorse.                      *Judgment affirmed*