## 1676. GEORGIA RAILROAD & BANKING CO. *v.* FULLER.

1. As a general rule a railway company, by allowing the members of the general public to pass constantly along or over its track at a given point, gives warrant to the inference that it consents to the use, so that persons using the track there as a thoroughfare or passageway are to be regarded, not as trespassers, but as licensees; but the conditions surrounding a switch-yard in which trains are made up, and through which engines and cars are constantly being moved and·shifted, are such as to preclude any such inference from arising from mere public user. Only through express permission will a license arise in favor of an outsider who, having no business there, enters such a place.

2. To attempt to pass through two cars, standing close together in a railway switch-yard where cars are being shifted and trains made up, is such contributory negligence as will ordinarily defeat a recovery by one who, having no business there, has been hurt by a sudden and unexpected movement of the cars by trainmen unaware of his presence.

Action for damages, from city court of Atlanta—Judge Reid. January 16, 1909.

Argued March 10,—Decided June 15, 1909.

Rehearing denied July 31, 1909.

*McDaniel, Alston & Black,* for plaintiff in error.

*Westmoreland Brothers, J. Caleb Clarke,* contra.

POWELL, J. Fuller, a young man 19 years old, was hurt in the switch-yards of the Georgia Railroad in or near Atlanta. He sued the company and obtained a verdict. To the overruling of a motion for a new trial the defendant excepts. The Georgia Railroad yards leading out from the city of Atlanta are extensive both in length and breadth. The point where the injury occurred is about in the middle of the yards, at perhaps its busiest portion. It is undisputed in the evidence that at the place of the injury were ten or twelve parallel tracks upon which trains were constantly moving by day and by night. It was here that not only the regular trains passed, but other trains were made up. At this point Carroll street comes up to the tracks on the south side and ends in a cul de sac. From the end of this street, by crossing the tracks of the Georgia Railroad and going down a slight embankment to the tracks of the Southern Railway and across these, and up an embankment and through one or more strands of a wire fence, one could reach Decatur street running parallel with the tracks. The plaintiff with a companion had gone from his home on Carroll street across these tracks to Deca-

tur street, and was returning. He came under the barbed wire, down some steps, over the embankment, across the Southern Railway tracks, and up to the first track of the Georgia Railroad. On this track, extending in each direction, was a long string of cars, but between two of them was a small opening; the bumpers of the cars being about three feet apart. The companion passed through in safety, but as the plaintiff started through, and just as he placed his hand upon the bumpers to swing himself through, the cars came together with a sudden crash, and he jumped backward. He was unable to get himself entirely off the track, and one of the cars passed over his leg. The plaintiff does not insist that the railroad company or its servants knew of his presence; but he rests his case upon the proposition that the people of the community had been accustomed to cross these yards and this track for so long a time and so constantly as to raise an implication that the company had licensed them to do so, and that as a result of this license or implied permission the company owed to the plaintiff the duty of anticipating his presence, and of not backing the cars upon him without signal or warning and without having a watchman to keep a lookout so as to prevent injury from the sudden movement of the cars at this place where persons were thus accustomed to pass. The judge charged the jury as follows: "The law recognizes that there may be such a constant use of a railroad track by pedestrians as a pathway as to put the railway company and its servants engaged in operating its trains upon notice of such use, and further recognizes that the use may be of such a character as to cause the railroad and its servants operating its trains to anticipate the presence of pedestrians at such place." Also, "Whether there was such use by pedestrians, and whether the use was of such a character as to put the defendant and those operating its trains upon notice and require them to anticipate the probable presence of pedestrians at that particular place, are questions of fact for your determination." To these instructions exceptions are taken.

The plaintiff showed that a great many people did in fact pass through these yards at this point; and that there was a beaten path across the tracks, up the embankment and under the wire fence. It was further shown that brakemen and other employées, under instructions from their superior officers, had from time to

time, when the trains were standing in this portion of the yards and were blocking the passage of people, caused the cars to be uncoupled so that people might pass through them. About 150 yards from the place of the injury was a public street containing an underpass by which the plaintiff could have gone under the tracks in safety.

1. It is well recognized that the only duty ordinarily owing by a railroad company to a trespasser upon its tracks is not to injure him wilfully or wantonly. *Charleston Ry. Co.* v. *Johnson,* 1 *Ga. App.* 443 (57 S. E. 1064) ; *DeVane* v. *A., B. & A. Railroad Co.,* 4 *Ga. App.* 136 (60 S. E. 1079). Usually one who intrudes himself upon the tracks of a railroad at a point other than a public crossing or some other place which has been set apart for public use, is a trespasser. However, there are exceptions to the generality of this rule, and, as the judge charged the jury, the law recognizes that in some instances there may be such constant use by pedestrians of the tracks as a pathway as to put the railway company upon notice of this use, and raise the duty on its part of anticipating the presence of people thereon and of using ordinary care and diligence not to injure them. We need not cite the long array of cases in this State by which this doctrine is established; the cases are familiar to the profession. But this exception to the general rule is without applicability when applied to a switch-yard of the kind involved in the case at bar. The rule which requires of a railway company the duty of anticipating the presence of people on its tracks rests upon the proposition that by the extent of the use the company has impliedly consented to and licensed the use, so that people thus upon the track are not trespassers in the full sense of the word, but are licensees. The inference of the company's permission in such a case is a natural one, and there is nothing in general public policy which would prevent its being indulged by the public in going upon the railroad's property, or by the courts and juries in deciding a case where one of the public using the tracks of the company under such circumstances has been injured by reason of the fact that the employees of the company did not anticipate his presence, or did not use ordinary care to keep from hurting him after his presence became known or in the exercise of a reasonable degree of anticipation should have become known. There is, however, no basis

for indulging any such inference as to the switch-yard of the company, netted with tracks upon which trains are being constantly moved and shifted. These places are so extremely dangerous that to raise the presumption of a license would be to raise a very unnatural presumption. As the Supreme Court said in the similar case of *Central R. Co.* v. *Rylee*, 87 *Ga.* 491 (13 S. E. 584, 15 L. R. A. 634), "The joint use by the company and by the public of the tracks at the same time would be so inconsistent and so dangerous that the law will not imply a license from the company to the public for such joint use." As the court holds in that case, only express consent would serve to license a throughfare under such circumstances. In order that the railway company may fulfil its public functions,—that it may discharge its duty of serving the public promptly and efficiently, it must have places at which trains can be made up, and cars shifted promptly, speedily, and without the employees having to be on guard against the intereference of those members of the public who have no business to be there. The courts of this State, therefore, while recognizing the rule that there may be places where persons by mere generality of user can acquire the rights of licencees, and thereby deserve a higher degree of care than trespassers, have never applied the rule to switch-yards of the character of the one involved here. See *Grady* v. *Ga. R. Co.*, 112 *Ga.* 668 (37 S. E. 861); *Rome R. Co.* v. *Tolbert*, 85 *Ga.* 447 (11 S. E. 849); *Central R. Co.* v. *Rylee*, supra; *Curtis* v. *So. Ry. Co.*, 130 *Ga.* 675 (61 S. E. 539); *So. Ry. Co.* v. *Mouchet*, 3 *Ga. App.* 266 (59 S. E. 927). In *Rome R. Co.* v. *Tolbert*, supra, in the third headnote the court recognizes the difference between the rights of the public as to switch-yards and as to other places on the tracks. The *Grady* case, supra, is so nearly identical with the one at bar, both as to the place of the injury and as to the circumstances of it, as to make it a controlling physical precedent. That case differs from the one at bar in substantial features only in that it was proved in this case, and not in that one, that brakemen and other employees, under the direction of their superior officers, had frequently unblocked the pathway from Carroll street to Decatur street by making openings between cars in order that persons might pass. It seems that there is a factory on Decatur street, and that frequently employees therefrom would crowd upon the tracks at this point,

and that the cars would be unblocked by the trainmen in order to let the factory employee through. It must be remembered, however, that when the cars were unblocked for this purpose, the intruders were already upon the tracks, in a place of danger,— already in a position where they were interfering with the natural movement of the trains; and therefore it would be unjust and unreasonable to raise the inference that the company was inviting them to use its premises as a thoroughfare, simply because its employees assisted them from the place of danger to a place of safety by unblocking the cars and allowing them to pass over the tracks. Instances like this do not, in any just sense, fulfill the measure stated by the Supreme Court, that there must be an express license or invitation or permission from the company, in order to raise the duty of anticipation as to such intruders upon one of these highly dangerous switch-yards.

2. Where one is injured while attempting to pass through the switch-yard of a railroad, a recovery is frequently denied on another ground—that the party's own act in going into the place of danger is the proximate cause of his injury. The Supreme Court of Appeals of West Virginia, in the case of Huff v. Chesapeake R. Co., 48 W. Va. 45 (35 S. E. 866), said, "Several hundred yards from the point of accident the company had placed signal boards of warning, telling everybody .to keep off the tracks of that yard, as trains might be expected in at any time, and that it was a dangerous place. But who would want any signal board of such warning? That yard was full of tracks, constantly in use by passing trains, and in switching, making up, and handling trains, and dotted with switch-lights showing the various tracks. A railroad track anywhere is alone a warning of great danger; but how much more dangerous is that yard at Handley, full of tracks, trains, and engines at all times or at any time? We may safely say that scarcely anywhere on earth, in broad daylight, could a more dangerous place be found," etc. And as the Supreme Court of our own State said in the case of Rome R. Co. v. Tolbert, supra, "Such person is bound to use diligence commensurate with the peril in which he has placed himself; and if he fails to do this, he can not recover for any injury he may sustain from the running of the engines and cars of the company." In the case of Western & Atlantic R. Co. v. Bloomingdale, 74 Ga.

604, 610 (a case, by the way, arising from an injury which occurred in this same switch-yard), the court refers to the doctrine that no person can recover for damages caused by his own negligence, and, after conceding that it was probably shown that there had been some lack of diligence on the part of the defendant, said: "Be this as it may, however, according to the record, we think the plaintiff's injury was the result of his own negligence, and that he could have avoided it by the exercise of ordinary care. What occasion, necessity, or excuse was there for the plaintiff to go upon this railroad yard at the time and under the circumstances then existing? None whatever. There were several good streets leading to his home, . . all well lighted with gas, and provided with good footways, all leading to his home, and making access thereto easy and pleasant. It was, perhaps, a nearer or more convenient way down the railroad track, but this is no excuse for voluntary peril." So the plaintiff in this case, who, instead of crossing at the public underpass about 150 yards away, chose to crawl under the barbed wire, down the embankment, across the tracks, and through this narrow opening in the cars at a place of extreme danger, is to be regarded as the author of his own injury; and neither in good law nor in good morals should he be allowed a recovery.        *Judgment reversed.*