### 3873. WILLIAMS, by next friend, v. SOUTHERN RAILWAY COMPANY et al.

1. It is a sound and wholesome rule of law, conservative of human life and limb, that, without regard to the question whether a person killed or injured by a railroad train was a trespasser or a licensee upon the track, those in charge of the running of the trains are bound to exercise

20

ordinary care and diligence in approaching any point where people may be expected to be upon the track, or where the road-bed is constantly used by pedestrians.

2. While a railroad company is entitled to the exclusive use of the tracks in its switch-yards, and there can be no implied license to the public to use such tracks, inconsistent with this exclusive right, yet this rule applies to switch-yards proper, and has no application to a case where there is only one track, which is the main track of the company, although this track may be partly within the yard limits and is occa-sionally used in connection with the switch-yard.

3. Where a railroad company has laid planks across its trestle, or per-mitted the planks to be laid there, and people have used these planks as a footway across the trestle for years, it is not negligence per se for a pedestrian to use them for that purpose. It is a question for the jury to determine whether or not the extent of the use of the trestle as a footpath, and the length of time such use has continued, have been sufficient to impose upon those operating the trains of the company the duty of anticipating the probable presence of persons on the track, and, in approaching that particular point, to exercise ordinary care and watchfulness to avoid injury to them. And it was for the jury to determine whether, under all the facts and circumstances, the plaintiff was guilty of such contributory negligence as would bar his right to recover.

POTTLE, J. To attempt to walk across a long, high, and narrow railway trestle, without ascertaining that a train is approaching, is so ob-viously and inherently dangerous as to prevent a recovery for an injury received as a result of a mere omission of the engineer to be on the lookout. Even if an invitation to so use a railway trestle will ever be implied, the mere presence thereon of a narrow plank, upon which a pedestrian can walk across with apparent safety, is not sufficient to authorize the inference that pedestrians are invited to use the plank as a footway, and impose upon the employees on the locomotive the duty of anticipating at a given time the presence of a trespasser upon the trestle.

DECIDED JULY 10, 1912.

Action for damages; from city court of Atlanta—Judge Reid. September 12, 1911.

Thomas L. Williams, a minor, by his next friend, sued the South-ern Railway Company and W. B. Robinson, an employee of the com-pany, to recover damages for personal injuries sustained by him in jumping from a trestle on its right of way, within the yard limits of what is known as Armour station, in Fulton county. He was endeavoring to cross the track over the trestle, and, to prevent being run over by a train of the defendant company, the locomotive of which was being operated by Robinson, he jumped from the trestle and received his injuries. The petition alleges, in substance, that Robinson, the engineer, could easily have seen

the petitioner on the track of the railway company for 200 yards before reaching the point where he was compelled to jump from the trestle in order to save his life, and that if Robinson had been performing his duties as engineer, in running the engine with proper care and diligence, he would have seen the petitioner in ample time to have stopped the engine before reaching him, or before it became necessary for him to jump from the trestle. It also alleges that Robinson was under the duty at the time to look out for pedestrians on the trestle, and to use ordinary care to prevent running them down or injuring them; and it is charged that the railway company and Robinson were negligent, (1) in running the engine at too great a speed across the trestle and within the yard limits of Armour station; (2) in not looking ahead and discovering the petitioner; (3) in not stopping the engine in time to prevent the necessity of petitioner's jumping from the trestle in order to save his life. By an amendment to the petition it was further alleged, (1) that the trestle was constantly used by pedestrians at Armour station, and that this fact was well known by the railway company and Robinson; (2) that Robinson individually and as an employee of the railway company was under the duty, at the time petitioner was run down and compelled to jump off the trestle, in passing over the trestle, to look out for pedestrians thereon, and to use ordinary care to prevent running them down and injuring them; (3) that as a matter of fact Robinson saw petitioner upon the trestle when the engine was 600 yards from him, and that if he had exercised ordinary care, he could easily have stopped the engine in time to prevent the injury to plaintiff. A general demurrer to the petition was overruled.

The plaintiff's evidence made in substance the following case: Between two and three o'clock in the afternoon of March 17, 1909, he was walking on the trestle of the railway company, going towards Armour station, which was south of the trestle. The trestle was from one hundred to three hundred yards in length, passing over Peachtree creek and the tracks of the Seaboard Air-Line Railway. The distance from the trestle to the ground below was from twenty-five to a hundred feet. The trestle was narrow at the southern end. The point where the plaintiff jumped from the trestle was about thirty or forty feet from the ground. There was only one track across the trestle, and this was the main track of

the railway company. In the middle of the trestle there was a plank walk, extending entirely across the length of the trestle, with the exception of a few feet on both ends. This walkway consisted in some places of two planks, two by ten or two by twelve inches. In some places, however, there was only one of these planks. This plank walkway had been on the trestle for five years before the injury, but has been taken up since that time. Plaintiff was about half-way across the trestle when he first heard and saw the approaching engine, and in his opinion the engine was then about three or four hundred yards away. The engine was pulling a freight-train and was running about twenty-five or thirty miles an hour. The engine was a switch-engine. The only signal which the plaintiff heard from the approaching train was the blowing of the whistle four or five times in rapid succession when he was about midway the trestle. North of this trestle and about seventy-five yards from the end there was a deep cut. The track over this cut to Armour station, going south, was practically straight, there being only a slight curve. The curve was on the right-hand side of the engineer going towards Armour station, and there was an unobstructed view from the cut to the trestle. As soon as the engineer got out of the cut he could see the whole trestle. About four or five hundred yards north of the trestle is a public-road crossing, known as Mason's crossing. The only way to get to Armour station from this crossing is to cross the trestle or go around on this road, a distance of a mile. Plaintiff did not know anything about the latter way of getting to Armour station. He was a stranger there and had never been on the trestle before. He did not know that Armour station was just south of the trestle. At this point it was impossible to cross the creek except by way of the trestle, for the reason that the ravine traversed by the trestle was deep, rough, and precipitous.

The country on the north side of the trestle was settled to some extent, and, while there were no houses between the trestle and the crossing, there was a small country settlement just beyond the trestle,—about eight houses occupied by workmen. South of the trestle the country was rather thickly settled with fertilizer plants and dwelling-houses. This trestle was used frequently and generally both by the employees of the fertilizer plants and by other people living on both sides of the trestle. There were about four

hundred employees at the plant, and the people used this plank footway as a path. This pathway was used more frequently in the morning and at night by the employees of the plant in going to and from their work, and had been so used for some five years. This trestle is within the yard limits of Armour station. About ten or fifteen steps from the south end of the trestle there is a switch-track running from the main line; and fifteen or twenty steps farther on there is another switch-track, running parallel with the main track. The switch-track proper does not extend across the trestle to the other side, but the railway company, as occasion may require, switches its cars out on and beyond the trestle, and there was a great deal of switching in the yards, the moving of cars being constantly carried on.

At the conclusion of this evidence counsel for the railway company moved the court for a nonsuit, which, after argument, was granted; and the plaintiff excepts to this judgment.

*Anderson, Felder, Rountree & Wilson, George P. Whitman,* for plaintiff.

*McDaniel & Black,* for defendant.

HILL, C. J. (After stating the foregoing facts.)

1. The first legal question arising under the facts is, what relation did the plaintiff occupy to the railway company at the time of the injury, and what corresponding duty did the company owe to him? Was he a trespasser or a licensee? It is insisted by the railway company that he was a trespasser, and by the plaintiff that he was a licensee. The rule of law governing both relations is well settled in this State by repeated decisions of the Supreme Court and of this court. If plaintiff was a trespasser, the only duty which the railway company and its employees operating the train owed to him was not to injure him wilfully or wantonly, or by reckless and gross negligence amounting to wantonness; in other words, to observe ordinary care to avoid injuring him after his presence had become known to the employees operating the train. *Georgia Railroad Co.* v. *Fuller, 6 Ga. App.* 454; *Atlantic Coast Line R. Co.* v. *Riley, 127 Ga.* 566. If, under the facts, he was a licensee,—that is, if the evidence showed that the plank pathway across the trestle had been used constantly by pedestrians for such a length of time as to put the railway company on notice of this use,—its employees operating the train were charged with

the duty of anticipating their presence thereon and to use ordinary care to avoid injuring them. *Ashworth* v. *Southern Ry. Co.,* 116 *Ga.* 635; *Bullard* v. *Southern Ry. Co.,* 116 *Ga.* 647; *Crawford* v. *Southern Ry. Co.,* 106 *Ga.* 807; *Hardin* v. *Georgia R. Co.,* 3 *Ga. App.* 344; *Georgia R. Co.* v. *Fuller,* supra, and *Shaw* v. *Georgia R. Co.,* 127 *Ga.* 8; *Macon & Birmingham Ry. Co.* v. *Parker,* 127 *Ga.* 471.

It is insisted by counsel for the railway company that a trestle over which a train runs is in itself a place of such great danger that an implied license to walk on it can never arise by mere user of it by the public, and that even if such implied license could arise as to the use of the trestle, it did not arise in the present case, because the trestle was in the switch-yard at Armour station, and, under the repeated rulings of this court and the Supreme Court, no implied license can ever arise for the public to use railroad tracks in a switch-yard, but, to authorize such use, there must be an express license. We can not agree to the first proposition without qualification. It is true that a railroad trestle may be a place of such manifest danger as not only to preclude any implied license to use it, but to show the grossest sort of negligence in a pedestrian to use it; as, for instance, where the trestle is long and high and too narrow to permit one to safely stand on the side while a train is running over it, and there is nothing indicating consent, actual or constructive, by the company, to its use by the public as a walkway. But if the circumstances upon which such implied license is claimed indicate some affirmative action on the part of the company, not only inviting its use by the public, but minimizing the danger of its being used as a pathway, we think such implication might arise. If the company placed planks across the trestle to be used as a pathway, not only by its employees, but by the public generally, or if the company permitted the people in the neighborhood to place the planks across the trestle and to use them as a walkway for a long period of time, could it be said that these acts could not amount to a license to pedestrians to so use the trestle?

Some authorities go to the extent of holding that a license to use the track of a railroad company applies only to public crossings, or near depots and stations where, from the frequency of its use by pedestrians, the company has reason to apprehend their presence. But the Supreme Court of this State extends the rule

to pedestrians who may be using the track longitudinally, and to any place on the track which is habitually used and frequented by the public with the knowledge of the employees of the railway company and those in charge of the running of the train. In *Western & Atlantic Railroad Co.* v. *Meigs,* 74 *Ga.* 857, it was held that the trial court was right in admitting testimony relating to the habit of the public in walking on the track of the railroad at and near the place where the injury happened. And in *Shaw* v. *Georgia Railroad,* 127 *Ga.* 8, where Mr. Justice Atkinson, speaking for the court, reviewed the decisions of the Supreme Court on this subject, it was held to be a question of fact, to be submitted to the determination of the jury, as to whether that part of the railroad track which was the locus of the homicide was so frequently used by the public as a pathway, with the knowledge of the railroad company, as to require the servants of the company engaged in operating the train thereon to anticipate the presence of pedestrians. But, after all, there is little substantial difference in the rule of law applicable to trespassers and licensees. If the employees of the railway company, or those in charge of the running of its trains, have knowledge that the public, either as trespassers or as licensees, may be expected to be upon the track at a particular place, it is their duty to anticipate this presence and to use proper care and diligence to avoid injuring them. As expressed by Judge Thompson in his most valuable treatise on the Law of Negligence, "it is a sound and wholesome rule of law, humane and conservative of human life, that, without regard to the question whether the person killed or injured in the particular case was-or was not a trespasser or a bare licensee upon the track of the railway company, the company is bound to exercise special care and watchfulness at any point upon its track, where people may be expected upon the track in considerable numbers, as, for example, in a city where the population is dense; even between streets where the track has been extensively used for a long time by pedestrians; *or where the roadbed is constantly used by pedestrians;* or at a bridge in a thickly settled community which the public, in considerable numbers, have used for many years. At such places the railway company is bound to anticipate the presence of persons on the track, to keep a reasonable lookout for them, to give warning signals, such as will apprise them of the danger of an approaching train, to moderate the speed

of its train so as to enable them to escape injury; and a failure of duty in this respect will make the railway company liable to any person thereby injured, subject, of course, to the qualification that his contributory negligence may bar a recovery." 2 Thomp. Neg. § 1726. And in the case of *Western & Atlantic Railroad Co.* v. *Meigs,* supra, the Supreme Court says: "While this habit [the habit of walking on the railway track], even if acquiesced in by the railroad company, did not prevent the deceased from being a trespasser, it was a circumstance which the jury might properly consider in determining whether or not the persons in charge of the train showed proper diligence at the time the killing occurred. Railroad engineers should observe more caution in running at places where they know persons are likely to be on the track than elsewhere, even if those persons are trespassers, and especially is this true when the company has at least tacitly consented to this otherwise unauthorized use of its property by the public." This language is quoted with approval in *Bullard* v. *Southern Ry. Co.,* 116 *Ga.* 644, and also in the *Shaw* case, supra. That eminent jurist and lawyer, to whom the profession is much indebted, Judge Hopkins, in his work on Personal Injuries, § 87, states the rule as follows: "Where no permission is given, but there is a habit on the part of individuals or the public of traveling over the track on foot, and nothing is done to prevent it, that does not modify or change the legal rights or obligations of either the public or the company. By such use the public are not tacitly licensed to go upon the track, and the consent of the company to the use is not implied, *but the fact that they do go there enters into the situation as it is known to the company and affects the caution and amount of care required in running the trains."*

Let us apply to the facts of this case the rule as thus announced. It is true there was a long and high trestle and it was narrow, not safely permitting one to stand on its side while a train was passing, but, notwithstanding this dangerous character of the trestle, there were two planks in the middle of the track, used as a pathway by the public. There was no other apparent purpose for which they could have been used. The evidence is silent as to whether they were actually put there by the railway company or by others. But this is immaterial. We are obliged to assume that they were placed there with the knowledge of the railway company,

or that they were permitted to remain there and were used with the knowledge of the company, for a period of five years. The evidence does not show that these planks were placed there exclusively for the use of employees of the company. On the contrary, it does show that they were used as a pathway by the public generally, the people who lived in that neighborhood, and the employees of the Armour factory in the mornings and evenings. There was no other way to conveniently cross the ravine and creek. Can it be reasonably said that these facts did not present a situation where it became the duty of those in charge of the running of the trains to anticipate the presence of pedestrians on the trestle, and consequently to exercise due diligence to avoid injury to them? We conclude that "a sound and wholesome rule of law, humane and conservative of human life," is to impose upon railroad companies the duty of special care, where people are to be expected on the tracks, whether as trespassers or licensees. It is the frequency of the use, and not the character of the use, that raises the duty of anticipation and diligence. The evidence relating to this question is not so free from doubt as to demand a legal conclusion. But whether there was such frequent and continual use of the trestle by the public with the knowledge of the railway company as to impose upon those who were operating its trains the duty of anticipating the presence of pedestrians at that point, and whether, with such notice and resultant duty, ordinary and reasonable care was exercised by them, should have been submitted to the jury for determination. *Bullard* v. *Southern Ry. Co.,* supra; *Shaw* v. *Georgia Railroad,* supra; *Macon & Birmingham Ry. Co.* v. *Parker,* supra; *Smith* v. *S., F. & W. Ry. Co.,* 84 *Ga.* 698.

2. The "switch-yard doctrine" is invoked by the railway company as a complete bar to the right of recovery. This doctrine is well settled by the decisions of this court and the Supreme Court. There can be no implied license to the public to use switch-yards. *Georgia R. Co.* v. *Fuller,* supra; *Waldrop* v. *Georgia R. Co.,* 7 *Ga. App.* 342; *Grady* v. *Georgia R. Co.,* 112 *Ga.* 668. This rule is applicable to switch-yards in fact; switch-yards interlaced with tracks, used constantly for the storing and switching of cars; switch-yards where danger signals are manifest and speaking. As to these the companies have the right to the exclusive use, and the public are affirmatively warned to keep out. But a railroad company can not

use its main track for switching purposes as occasion may require and thus make the one track a part of the switch-yard. If so, they could have switch-yards extending for miles with nothing to put the public on notice of their character. In *Grady* v. *Georgia R. Co.,* supra (the leading case on the subject), it is said: "In a railroad yard in which there are several tracks in continuous use for the purpose of storing and switching cars and making up trains and the like, and where the dangerous character of the place is manifest and obvious, there can be no implied license to the public to cross the tracks," etc.

As thus reasonably defined, the facts of the present case do not bring it within the switch-yard rule. Here there was only the one main track across the trestle, used infrequently for switching purposes, never for storing cars, with nothing whatever to indicate that it was a part of the switch-yard, or to put a pedestrian on notice of any unusual danger in this respect in using it.

3. It is insisted by learned counsel for the company that plaintiff was guilty of gross negligence in going upon the trestle, and that this negligence was the efficient cause of his injury. In support of this contention decisions of the Supreme Court are cited where it is claimed that the act of going upon a railroad trestle was held to be such gross negligence as would prevent recovery in any case. In these cases there was no question made as to the use of the trestle by the public as a pathway, either as trespassers or as licensees. There was no plank walk across the trestle inviting the public to use it. Pedestrians crossed or attempted to cross by stepping from cross-tie to cross-tie, and in each case there were circumstances emphasizing the negligent use of the trestle. In *Atlanta & Charlotte Air-Line Railway Co.* v. *Leach,* 91 *Ga.* 419, the plaintiff attempted to cross a long, narrow trestle, by stepping on the cross-ties, encumbered with a small boy, and Mr. Justice Lumpkin said: "He had no right to go upon the trestle at all, and in no event could he voluntarily encumber himself in any manner." In *Georgia Railroad Co.* v. *Richardson,* 80 *Ga.* 727, plaintiff went upon a trestle in the nighttime, about the time he knew a train was due to pass on the trestle. There was no evidence of any plank walkway across the trestle. In *Atlanta & Charlotte Air-Line Railway Co.* v. *Gravitt,* 93 *Ga.* 369, a suit by a mother to recover for the death of her minor son, the negligence

of the boy's uncle, who was in charge of him in taking him on the trestle, when there was a safe and convenient dirt road parallel with the railroad track, was a controlling fact. In that case it was expressly held that there was no license shown from the company to walk upon the trestle. We deduce from a consideration of these cases, and others of like character, that the Supreme Court has never held that the mere act of using a trestle as a crossway was itself so grossly negligent as to bar recovery. It depends upon the facts of the particular case, and is ordinarily to be determined by the jury.

Unquestionably the plaintiff was guilty of great negligence. He was a stranger, wholly ignorant of the schedule, had no reason to believe that a train would not pass any moment, saw the long, high, narrow trestle, saw the curve only seventy-five or a hundred yards north, hiding the trestle from the view of the engineer, and yet he ventured to cross. Did he not take the chances? But for the plank walkway inviting him to cross, and giving him the right to assume that his presence would be anticipated, and that the engineer in charge would use care in approaching the trestle, so as to avoid injuring him, we would unhesitatingly hold that he did. There is no evidence whatever that the engineer was guilty of wilfulness, wantonness, or reckless negligence amounting to wantonness. Whether he failed in the duty of diligence, in view of the facts, and whether such failure was the efficient, predominating cause of the injury, or whether it was the negligence of the plaintiff, are questions which we think can only be safely and justly determined by a jury; and so believing, the judgment awarding a nonsuit is reversed.                                              *Judgment reversed.*

POTTLE, J., dissenting. The gist of the opinion of the majority may be gathered from the following excerpt from the opinion: "Unquestionably the plaintiff was guilty of great negligence. He was a stranger, wholly ignorant of the schedule, had no reason to believe that a train would not pass any moment, saw the long, high, narrow trestle, saw the curve only seventy-five or a hundred yards north, hiding the trestle from the view of the engineer, and yet he ventured to cross. Did he not take the chances? But for the plank walkway inviting him to cross, and giving him the right to assume that his presence would be anticipated, and that the engineer in charge would use care in approaching the trestle, so

as to avoid injuring him, we would unhesitatingly hold that he did. There is no evidence whatever that the engineer was guilty of wilfulness, wantonness, or reckless negligence amounting to wantonness." This being the court's view, the discussion in reference to the frequency of the use of the trestle as a footway by others is entirely academic, and the evidence of such use wholly immaterial. I do not challenge the correctness of the principle, that if the employees in charge of a railway train have reason to anticipate the presence of a trespasser on the track at a given time and place, a duty arises, based upon "a sound and wholesome rule of law, humane and conservative of human life," to use ordinary care to prevent injury to such trespasser. This does not change, but is merely an application of, the general rule, repeatedly announced by the Supreme Court and by this court, that the only duty owing a trespasser is not to injure him wantonly or wilfully; for if an engineer has reason to suspect the presence of a trespasser on the track, failure to use ordinary care for his protection would be such gross negligence as to amount to wantonness. The *Shaw* case (127 *Ga.* 8), cited by the majority, is authority for the proposition that the frequent use by pedestrians of a railway track longitudinally at a given point "enters into the situation *as it is known to the company* and affects the caution and amount of care required in running the trains." That case does not rule that such use of the track raises an implied license or right of user, for the court quotes approvingly from Judge Hopkins as follows: "By such use the public are not tacitly licensed to go upon the track, and the consent of the company to the use is not implied." The decision in the *Shaw* case was placed upon the ground that the defendant company knew of the frequency of the use of the tracks by pedestrians at the place of injury, and with this knowledge was guilty of negligence in failing to keep a lookout for trespassers. In the absence of knowledge by the company of such use of the tracks, manifestly no duty to anticipate the presence of a trespasser can arise. Upon this idea the case of *Comer* v. *Hill*, 101 *Ga.* 340, was decided. In that case the wife of the defendant's bridge-keeper was killed on a trestle. She had been in the habit of using the trestle as a means of reaching her house. The court held that the company was not shown to have been under any duty to keep a lookout, because of the absence of proof that the employees connected

with the running of the train knew of the habit of the deceased to use the trestle, although it appeared that employees in charge of the road-bed did have such knowledge. The court held: "The plaintiff's wife, therefore, being upon the trestle without authority and without the knowledge of the defendants, the only duty which was owing to her was to use all ordinary care to prevent harm coming to her after her presence upon the trestle was discovered." There being no evidence that the defendant's employees knew of the habit of pedestrians to use the trestle as a footway, the frequency of such use affords no ground for recovery by the plaintiff.

The opinion of the majority is predicated solely upon what it assumes to have been an implied invitation to use the trestle. So far as I am aware, this is the first time any court has held that an invitation to use as a footway a long, high, narrow railway trestle will be implied from the mere presence on the trestle of a means or instrumentality by the use of which passage may be effected with apparent safety. In my opinion, there is no authority in the decisions of the Supreme Court for such a conclusion. The plank was about a foot wide and did not extend across the trestle at either end. On the contrary, there were a few feet of open space at each end of the trestle before the planks were reached. The trestle was four hundred and fifty to five hundred feet long, about fifty feet high, and too narrow to enable a person to remain thereon safely while a train was passing. There was some evidence that a notice was posted, warning persons not to go upon the trestle. The plaintiff could read, but says he did not see the notice. He had no right to assume that he had permission to walk across the trestle merely because a plank was there on which he could walk. Doubtless the plank was placed there for use by the road-hands in connection with their duties in inspecting and repairing the trestle. The company was under no duty to provide a plank for the plaintiff, and yet, if, as the majority hold, the plank was an invitation to walk, the company would have been liable if the plank had broken and the plaintiff had in consequence been injured. Carried to its logical conclusion, the principle announced by the majority would prevent any master from employing means to make a dangerous instrumentality safe for his servants, for fear some stranger might accept the presence of the means as an invitation to use the instrumentality and be injured thereby. What right had the plain-

tiff to assume that the planks were put there for his benefit, rather than for use by the railroad employees at a time when their presence there was known and precaution taken for their safety? In my opinion the only thing he had a right to assume was that he might be able to cross with less likelihood of falling than if he walked on the ties. In going upon the trestle without ascertaining that a train was approaching, the plaintiff assumed the risk of injury, and is not entitled to hold the company liable for a consequence resulting, not from any breach of duty to him, but solely from his own rash act.