## WRIGHT *v.* SOUTHERN RAILWAY COMPANY.

Where a railroad company permitted pedestrians to walk longitudinally along its tracks within the switching-yard and corporate limits of a city which by ordinance prohibited the running of trains at a rate of speed in excess of six miles an hour, and a person, while walking on one of two main-line tracks connecting two switching-yards (which main lines also were used for switching purposes), was killed by a switch-train of the company, which at the time was running at a rate of speed in violation of the ordinance, and suit was brought against the company to recover damages for the homicide, it was a question of fact for the jury to determine, whether, under all the evidence (which tended to show that many persons were accustomed to walk on the track at the point where the homicide occurred), the servants of the company were under any duty to anticipate the presence of pedestrians on the track, and, if so, whether they exercised ordinary care and diligence to prevent the homicide. It follows that the court erred in directing a verdict in favor of the defendant·

FEBRUARY 13, 1913.

Action for damages. Before Judge Bell. Fulton superior court. November 2, 1911.

*Moore & Branch,* for plaintiff.

*McDaniel & Black,* for defendant.

HILL, J. Jane Wright brought suit against the Southern Railway Company to recover damages for the alleged tortious killing of her minor daughter, Idell Wright. At the conclusion of the evidence the court, on motion, directed a verdict in favor of the defendant; and the plaintiff excepted. The evidence disclosed the following facts: Between Brookwood and Armour station the defendant company had two railroad tracks, one known as the north-bound main line, and the other as the southbound main line, its trains moving upon them in a northern and southern direction, respectively. Between the two tracks was a space ten or twelve feet wide. The point at which the girl was killed was within the corporate limits of Atlanta. The tracks at this point were in a cut. Between the southbound track and the bank on the north side of the cut was a space varying from eight to fourteen feet in width. The defendant company had a switching-yard at Armour and one west of the Brookwood bridge, the two main tracks connecting them being also used for switching purposes. At the eastern end of the yard at Armour were six or seven tracks, and at the western end of the switching-yards also were a number of tracks. There were several factories at Armour, where approximately 200 persons were

employed. A large number of these employees were accustomed to walk along the tracks between Armour and Brookwood bridge each day, and at the latter place take a street-car for the city, and in returning would go over the same route. The pathway between the tracks furnished comparatively smooth walking in good weather, but in wet weather pedestrians would sometimes walk on the tracks. So far as the evidence discloses, no objection was made by the defendant to the use by pedestrians of its right of way above described. On the day of the homicide, while Idell Wright was walking on the southbound track, between the rails, going towards Armour, with her back towards Peachtree road, one of defendant's passenger-trains, known as the Vestibule Limited, came into sight, going south on the track on which she was walking. When she saw the train meeting her, she stepped off the track on which she was walking and into the space between the two tracks. From there she went upon the northbound track, and as she got upon that track, still walking in the same direction, a freight-engine, pushing cars in front of it, was upon the track going northward. She did not look in the direction from which the freight-cars were approaching. She stepped on the track about forty feet ahead of the freight-train, which was running about fifteen or eighteen miles an hour, and was killed by that train. The city ordinances prohibited the running of trains within the city limits at a rate of speed in excess of six miles an hour. ·

The undisputed evidence in this case was that the killing of the deceased by the defendant's train was within the corporate limits of the City of Atlanta, and that at the time of the injury the train was running at a rate of speed of fifteen miles, or more, an hour. In evidence was a certified copy of a city ordinance of Atlanta, which prohibited the running of trains within its corporate limits at a rate of speed in excess of six miles an hour. The defendant, therefore, at the time of the injury was guilty of negligence per se. *Central Ry. Co.* v. *Bond,* 111 *Ga.* 13 (7), 17 (36 S. E. 299) ; *N., C. & St. L. Ry.* v. *Peavler,* 134 *Ga.* 618 (68 S. E. 432). Whether this was negligence, however, with respect to the decedent will depend upon her relation to the defendant company at the time of the homicide, and the duty owing to her in the circumstances · under which she was killed. At the time of the fatal injury the deceased was walking upon one of the main-line tracks of the defendant,

29 .

but within its switching-yard limits, as set out in the foregoing statement, where the evidence tended to show that many persons were accustomed to walk each day longitudinally along the track to and from their work, without objection from the employees of the defendant. It is insisted that in these circumstances the deceased had no express license to be within the switching-yard limits of the defendant, and that there could not have been an implied license to be there, and she must, therefore, be regarded as a trespasser; and as there was no evidence to show that she was wantonly killed, there can be no recovery on account of her death. The record does not disclose any express license; and let it be conceded that there can be no implied license in the case of switching-yards. There was abundant evidence tending to show that pedestrians in considerable numbers were accustomed to walk along and upon the tracks of the defendant within its switching-yard limits as described, and no effort was made to prevent their doing so. The question which presents itself for decision in such a case is, therefore, can it be said, as a matter of law, where both the plaintiff and the defendant were negligent, that the defendant owed no duty to pedestrians within its described switching-yard limits, other than not to injure them wantonly after discovering them in a perilous position? Or was the defendant company, in such circumstances, bound to anticipate that pedestrians were likely to be on the track, and charged with the duty of exercising ordinary care to prevent their injury? We hold, that, under the facts disclosed by the present record, it was a question for determination by the jury whether the employees of the railroad company were under a duty to look out for pedestrians on the tracks at the particular place where they were accustomed to walk, and where the injury occurred; and also, if chargeable with this duty, whether the defendant used ordinary care to prevent the injury to the deceased. This ruling is supported by the following decisions of this court: *Southern Ry. Co.* v. *Chatman,* 124 *Ga.* 1026 (53 S. E. 692, 6 L. R. A. (N. S.) 283, 4 Ann. Cas. 675); *Southern Ry. Co.* v. *Brock,* 132 *Ga.* 858 (5), 859 (64 S. E. 1083); *Shaw* v. *Georgia Railroad,* 127 *Ga.* 8 (55 S. E. 960); *M. & B. Ry. Co.* v. *Parker,* 127 *Ga.* 471 (2), 474 (56 S. E. 616); *L. & N. R. Co.* v. *Rogers,* 136 *Ga.* 674 (71 S. E. 1102); *Kendrick* v. *S. A. L. Ry.,* 121 *Ga.* 775 (49 S. E. 762); *Crawford* v. *Southern Ry. Co.,* 106 *Ga.* 870 (33 S. E. 826). See

also *Williams* v. *Southern Ry. Co.*, 11 *Ga. App.* 305 (75 S. E. 572). It is the duty of a railroad company which has knowledge of the continuous use of its tracks by members of the public to anticipate their presence at the place or places where they are accustomed to use its right of way. But it is argued that this can not be the rule where the public uses the switching-tracks of a railroad company for a distance of a mile and a half, and that if it exists for that distance it might arise along its entire right of way. It is sufficient to say that the evidence in the present case shows it to have existed only within the corporate limits of the City of Atlanta, and the railroad company would have been entirely within its rights if it had taken the necessary steps to prevent the public from trespassing upon its tracks either within or without the city limits. The record shows no such effort, but on the contrary the public were allowed to use the right of way as a footpath from Brookwood to Armour.

It is insisted, that the use of a switching-yard as a footpath is so inconsistent with its use by the railroad company that no one can use it except by express authority; that there can be no implied license to use a switching-yard as a footpath; and that if there is neither express nor implied license, the one using the switching-yard as a footpath is a trespasser, and if killed while walking on the tracks, there can be no recovery unless the killing be wanton. In support of this doctrine defendant in error cites the cases of *Grady* v. *Georgia Railroad & Banking Co.*, 112 *Ga.* 668 (37 S. E. 861), and *Fowler* v. *Georgia Railroad & Banking Co.*, 133 *Ga.* 664, 668 (66 S. E. 900). In the latter case Mr. Justice Lumpkin said: "Some of the decisions of this court have indicated the existence of a difference as to whether any duty arises, from known frequency of use by trespassers, to look out for them in a switch-yard, where there are many tracks and constant shifting, drilling, and changing of cars, and on a main line of travel, where trains move in the accustomed duties of transporting persons and things from one place to another. *Rome R. Co.* v. *Tolbert*, 85 *Ga.* 447 (11 S. E. 849) ; *Central R. Co.* v. *Rylee*, 87 *Ga.* 496 (13 S. E. 584, 13 L. R. A. 634) ; *Grady* v. *Georgia R. Co.*, 112 *Ga.* 668 (37 S. E. 861) ; *Curtis* v. *Southern Ry. Co.*, 130 *Ga.* 675 (61 S. E. 539). See also 3 Elliott on Railroads, § 1258." But he adds: "Of course this does not mean that every switch or siding, at a station or in the country, along a main line of travel, will ipso facto turn the

place into a switch-yard within the meaning of these authorities. Whether the difference suggested is qualitative as to the kind of diligence required, or quantitative, so that the general rule relieving from liability as to trespassers on a main line, whose presence is unknown, becomes merely intensified in a 'switch-yard,' because of its particular character and use, certain it is that railroad companies must have some place to shift their cars and make up their trains, if they are to operate at all. If against their will, and in spite of walls and fences, trespassers can force their way into the 'switch-yard' of a railroad company, and require it to change the whole system of making up trains and shifting cars, not because its employees know of a trespasser's presence in a place of danger, but because they ought to anticipate that he might be there and that walls and fences could not keep him out, the making up of trains and getting them ready for departure would be greatly hampered and the liability of the company for injuries to trespassers extended to unreasonable lengths."

In the present case no fences or walls surrounded the right of way, but on the contrary it was left open and the public was accustomed to use the tracks in walking to and from their work. The track on which the injury occurred, while used for switching purposes, was not within the switching-yard proper. Two main lines connected the switching-yards at Armour on the east and beyond at Brookwood bridge on the west, the distance between the two being approximately one and a half miles. The deceased did not look down the track, when she slipped in front of the freight-car and was injured, to ascertain if a train was approaching. Whether under all the circumstances of the case the defendant exercised ordinary diligence and care in observing the presence of the deceased and in avoiding the injury to her are questions properly to be left to the jury under the rule above laid down. From what has been said above, it follows that the court erred in directing a verdict for the defendant.

*Judgment reversed. All the Justices concur.*