---

6975. WRIGHT *v.* ATLANTIC COAST LINE RAILROAD
COMPANY *et al.*

A railway company is entitled to the exclusive use of the tracks in its switch-yard, and there can be no implied license to the public to use such tracks, inconsistent with this exclusive right. There was no evidence from which the jury would have been authorized to find that the point where the plaintiff was injured was not within the limits of the switch-yard proper.

DECIDED JULY 19, 1916.

Action for damages; from city court of Savannah—Judge Davis Freeman.     September 8, 1915.

*Oliver & Oliver,* for plaintiff.   *P. W. Meldrim,* for defendant.

WADE, C. J.   The plaintiff was injured while attempting to cross one of five tracks used in a well-defined switch-yard of the railway company, by the backing of one of the defendant's trains. No lookout was kept at the rear of the train, and no warning was given by bell, whistle, or otherwise, and the evidence failed to show that any employee of the railway company actually saw the plaintiff at or before the time of the injury.   There was a safe and reasonably convenient subway provided for the use of pedestrians and others, so that they might travel in safety under the several tracks of the railway company at the place where the injury occurred, but the plaintiff and some others were accustomed to pass, for their convenience only, and not from necessity, over the tracks in the switch-yard.   The plaintiff knew that the point where he attempted to cross was within the limits of the switch-yard.   In response to the question, "You knew that was a switch-yard, you knew Mr. Harvey was switching cars in that yard?" he testified as follows: "Five tracks go on out through Anderson street, way on out.   The switch engine goes on down from Waldburg back to Liberty. . . I had been used to cross there.   I had seen trains being switched across before."   The following question was propounded to the plaintiff: "In order to suit your convenience, instead of walking down the subway, you came across this switch-yard?" he replied: "Across the subway, across the bridge. . . Nevertheless, with this switch-yard and the train switching, it suited my convenience to go across the yard instead of going across the subway."   He said further, "I know Mr. Harvey [the engineer in charge of the switch-engine at the time the injury occurred]; he is switch-engineer there."   The plaintiff endeavored to cross on planking laid down between the tracks and over the subway to protect those using the subway in passing under the switch-yard.

The case turns altogether upon the fact that the injury occurred in a switch-yard, and not upon a main track of the defendant company, either outside of the switch-yard or partly within the yard limits, and occasionally used in connection with the switch-yard, as in *Williams* v. *Southern Railway Co.,* 11 *Ga. App.* 305 (75

S. E. 572). In the case of *Western & Atlantic R. Co.* v. *Watkins,* 14 *Ga. App.* 388 (80 S. E. 916), this court said: "The homicide did not occur in a switch-yard, and the rule that there can be no implied license to use the tracks of a railway company in its switch-yard has no application." In *Binion* v. *Central of Ga. Ry. Co.,* 12 *Ga. App.* 663 (78 S. E. 132), this court also said, in construing the decision in *Wright* v. *Southern Ry. Co.,* 139 *Ga.* 448 (77 S. E: 384) : "The evident purpose of the Supreme Court in the case cited above, was to limit the switch-yard doctrine to switch-yards proper, and to tracks which are constantly being used as switch-tracks. They doubtless did not intend to hold, nor do we, that a person could have an implied license to use a track in a switch-yard proper, which was being constantly used for switching purposes, merely because it was occasionally used as a main line." In the *Williams* case, supra, this court said: "This doctrine [the switch-yard doctrine] is well settled by the decisions of this court and the Supreme Court. There can be no implied license to the public to use switch-yards. *Georgia R. Co.* v. *Fuller,* supra [6 *Ga. App.* 454 (65 S. E. 313)] ; *Waldrep* v. *Georgia R. Co.,* 7 *Ga. App.* 342 [66 S. E. 1030] ; *Grady* v. *Georgia R. Co.,* 112 *Ga.* 668 [37 S. E. 861]. This rule is applicable to switch-yards in fact; switch-yards interlaced with tracks, used constantly for the storing and switching of cars; switch-yards where danger signals are manifest and speaking. As to these the companies have the right to the exclusive use, and the public are affirmatively warned to keep out. But a railroad company can not use its main track for switching purposes as occasion may require and thus make the one track a part of the switch-yard. If so, they could have switch-yards extending for miles with nothing to put the public on notice of their character. In *Grady* v. *Georgia R. Co.,* supra, . . it is said: 'In a railroad yard in which there are several tracks in continuous use for the purpose of storing and switching cars and making up trains and the like, and where the dangerous character of the place is manifest and obvious, there can be no implied license to the public to cross the tracks,'" etc.

The evidence in the case under consideration does not show that the injury occurred on a main track used for switching purposes only as occasion might require, and which only thus constituted a part of the switch-yard. In the *Williams* case, supra, it will be

noted that "there was only the one main track across the trestle, used infrequently for switching purposes, . . nothing whatever to indicate that it was a part of the switch-yard." In the present case there were five tracks, with their switching connections, and the plaintiff actually saw the switching operations going on, and the car which injured the plaintiff was actually pushed backwards by a switch-engine in the charge of a switching engineer.

There is no merit in the contention of the plaintiff that he had an express license to enter the switch-yard, based on a conversation between him and the head boiler-maker of the defendant, who told the plaintiff to come out to the shops the morning the injury occurred. It does not appear that the boiler-maker, if empowered to license the plaintiff, authorized or directed him to cross the switch-yard where he was injured, in order to take the train, which stopped at a different place entirely, to go out to the shops, not located in the switch-yard, but some distance therefrom. The plaintiff was not at the time of the injury an employee of the defendant, for he testified, "They had laid me off from my job." It appears further, from his testimony, that during the time he worked for the defendant he habitually boarded the train which conveyed him to the same shops, either at Bolton or Huntingdon streets. The burden was upon the plaintiff, and there is no evidence to show that the place where the injury occurred was a place to board the train he expected to take to convey him to the shops, or was a place where this train usually stopped, but to the contrary his evidence showed, as above stated, that the stopping places for that train were at Bolton and Huntingdon streets.

From the testimony it appears that oft-repeated, if not continuous, efforts were made by the railway company to protect people from trespassing upon its tracks in this switch-yard, and in furtherance of these efforts a fence had time and again been constructed there by the company, and a policeman was stationed at times at this point to prevent or warn against such trespass. From an examination of the photographs which appear in the record, it is plainly apparent that a safe and convenient passage under the tracks had been provided by the defendant, and that the open spaces between the ties of the tracks in the yard overhead, and between the tracks themselves, must have been covered with the

planking, shown in one of the photographs, for the primary, if not the sole, purpose of protecting persons using the subway from falling objects dislodged or dropping from passing trains overhead. It does not appear from this last-mentioned photograph that the planking shown was so placed in order to make a bridge over the subway and thereby invite pedestrians or others to cross the tracks instead of going underneath them along the safe way provided, nor is there other evidence to this effect. The conclusion that no bridge was deliberately constructed for use at this point is confirmed by the testimony showing repeated and constant efforts on the part of the defendant to protect this identical planking from use as a bridge over the subway, or as a passageway across its tracks.

It does not appear that the engineer had any reason to apprehend the presence of the plaintiff on the track at the place where the injury occurred, notwithstanding some proof that other individuals frequently crossed at this point, and in the evidence nothing appears affirmatively from which it can be legitimately concluded that the engineer in charge of the switch-train ever actually saw the plaintiff at or before the time of the injury, notwithstanding the testimony of the plaintiff that he himself saw the engineer. The plaintiff does not testify that the engineer was looking in his direction, nor does he assert that the engineer was so situated that he could have seen him at the time of the injury.

Under the testimony as to the use of the track at the place where the injury occurred, and the consequent reason why the engineers of the defendant company might expect trespassers upon the track at this point, a different case would be presented had not the evidence definitely shown that the injury occurred within the limits of a switch-yard proper. Several cases cited by counsel for the plaintiff, which would be precisely in point had the injury occurred elsewhere than in a switch-yard, are clearly not controlling in this case. It is not for us to extend the rule definitely laid down by the Supreme Court, whose decisions are binding as precedents upon us; and we therefore hold that the trial court did not err in awarding a nonsuit. *Judgment affirmed.*