## SHAW v. GEORGIA RAILROAD.

1. Under the facts in this case, it should have been submitted to the jury to say whether that part of the railroad track which was the locus of the homicide was so frequently used by the public as a pathway, with the knowledge of the railroad company, as to require the servants of the defendant, engaged in the operation of trains thereon, to anticipate the presence of pedestrains. If the servants operating the train, in the exercise of ordinary care, should have anticipated the presence of pedestrians, then it was for the jury to say whether the servants were negligent in running the train over this particular place, under the attendant conditions, at such rate of speed as that it was impossible, after discovering the dangerous position of the deceased, to stop before striking him. It was erroneous, therefore, for the court to charge: "I charge you it is not lack of ordinary care and diligence to fail to keep a lookout for persons on the track not on a public crossing." "I charge you, the duty to exercise all ordinary and reasonable care and diligence towards a person not on a public crossing arises when his presence becomes known to the employees in charge of the engine, and not before. A failure of such care and diligence after that time, and from which injury occurs, unless it could have been avoided by the use of ordinary care on the part of the person killed or injured, will render the company liable."

2. In view of the evidence, and under the charge as a whole, there are no other assignments of error which are so meritorious as to require a reversal of the judgment of the court below.

Fish, C. J., and Beck, J., dissenting. The evidence demanded the verdict rendered, and, without reference to the alleged errors in the charge of the court, the refusal of a new trial was proper.

Submitted July 18,—Decided November 16, 1906.

Action for damages. Before Judge Holden. Oglethorpe superior court. January 16, 1906.

The petition alleged, that the plaintiff's husband, Henry Shaw, while passing near and along the defendant's railroad, "was seized by an unnatural and violent stupor, which rendered him insensible," and, while in that condition, he sat on the edge of a cross-tie on the track, where, without fault on his part, he was struck and killed by a locomotive of the defendant, pulling a train going east; that the place at which he was killed was about 500 yards east of the village of Arnoldsville, and within 400 yards east of a public-road crossing; that the defendant and its agents knew that the road at that point was used by the public and frequented by pedestrians; that his condition was such as to indicate to any one approaching that he was not in a condition to care for himself and avoid danger; that he was seen, or by the exercise of ordinary

care could have been seen, and his dangerous position discovered by the defendant's employees in charge of the train, in ample time to have prevented the killing; and that the whistle of the locomotive was not blown, nor the speed of the train checked, in approaching the crossing. The verdict was for the defendant. The plaintiff's motion for a new trial was overruled, and she excepted.

From the evidence it appears that Shaw was killed about 8, o'clock in the morning, October 21, 1904. He went on the railroad track at Arnoldsville and walked down it a short time before the train passed, and when next seen was sitting on the end of a cross-tie of the track, at a point about 700 or 800 yards from Arnoldsville. His head was down and in his hands, and his hat was on the ground in front of him. A witness for the plaintiff testified, that while walking towards the train he saw Shaw in this condition, and halloaed to him once or twice, but did not know whether he heard it; that the train gave a road signal when about 100 or 150 yards from Shaw, but did not stop until it had gone a distance which he supposed was 300 or 400 yards past the place where it had struck Shaw; that the track was straight from that point to Arnoldsville, whence the train had come, and that a man at that point could be seen from Arnoldsville. The train was not running on a regular schedule; it was a pay train, and passed a short time before the next regular schedule train passed. A witness for the plaintiff testified, that he saw Shaw that morning "about sun up," at a place at which Shaw worked as a farm hand, about a mile and a quarter from Arnoldsville, and the witness "could not see anything wrong with him, but he was sleepy," and said he had been up all the night before and had walked between 8 and 10 miles. A witness for the defendant testified, that about three quarters of an hour before the killing, or perhaps a little more, Shaw asked him for a match to light a cheroot, and "seemed to be drinking a little;" the witness did not have any talk with him. The plaintiff testified, that the deceased was strong, in good health, and able-bodied, but had spasms or spells, and when he had them would fall dead about half an hour or so. She had known him to have two of these fits,—one on Wednesday preceding the Friday on which he was killed, and the other several years before. When he had these two spells he complained beforehand about a swimming in his head. When he had the first spell he

fell suddenly, without warning. Another witness testified: "He was very sickly sometimes. . . He told me about three days before that he could feel the blind staggers coming on him. . . He told me he had a giddiness in his head." Another testified, that he saw Shaw have two fainting fits, and that he was in a stupor, unconscious at the time; he was taken from the field to the house, and remained in that condition a couple of hours.

Several witnesses testified as to the use of the railroad track as a pathway by pedestrians. One testified: "A good many negroes pass up and down there at different times a day. . . That is the same kind of walking along the track that you find all along the country, but there is a little more there, on account of there being quite a settlement there, and to go to the store; there are 15 or 20 houses there, scattered through a mile and a half. Sometimes I suppose an hour or two will go by without anybody passing, and may be a half day sometimes without anybody walking on the track." Another testified: "A plenty of folks use the track, . . walking on it all the time. Mr. Jackson was the section boss of the railroad at that time. He saw people walking on the track, and I talked with him. He was in charge of the road-bed along there, working the track." A public road ran alongside the railroad.

The engineer testified, that his train ran through Arnoldsville at a speed of about 40 miles an hour, and had increased its speed to about 50 miles an hour before he discovered that there was a man on the track; that he was about 300 yards from the man when he discovered him, sitting on the head of a cross-tie; that when he saw the man he began to blow the whistle and gave the danger signal, but the man did not move, and he discovered that something was wrong,—that the man was drunk or not at himself, and he (the engineer) began to do all he could to stop the train, but was not able to stop. He was about 200 yards from the man when he made efforts to stop. He could not have stopped the train in time to avoid striking the man if he had begun his efforts on first seeing him. From Arnoldsville the road is straight for half a mile. The track was down grade at this point and slick with dew. The train had been going down hill for 400 yards. It consisted of the locomotive and a pay car, and could not be as easily stopped as a heavy train. The engine went 150 yards after it had struck the deceased,

before it stopped. "Suppose I was running at 40 miles an hour, after I had applied the air-brakes, locked the wheels like I described, and sanded the track, the train would run 350 or 400 yards before it stopped." The distance from the public crossing at Arnoldsville to the place of the killing was, by actual measurement, 740 yards. The sun was in his (the engineer's) eyes, shadows of trees were across the track, and the man was in the shadow of a tree, and this prevented the witness from discovering him sooner. When he first saw the man he expected him to rise and join others who were approaching him. According to the fireman's testimony, he and the engineer discovered the deceased about the same time. He corroborated the testimony of the engineer in its main features. They testified as to the good condition of the engine and its equipments, and explained in detail the efforts made to stop the train.

*E. K. Lumpkin, W. M. Smith,* and *Paul Brown,* for plaintiff. cited: *Ga. R.* 124/1027, 1035; 116/638-9, 644; 106/873-4; 105/-101-2; 60/340(3); 51/583; 56/541; 66/173, 242-3; 69/619-21; 71/22, 222; 72/218-25; 76/770; 77/181; 79/234; 84/363, 698; 96/177; 124/384-5; Hopk. Pers. Inj. 142 (sec. 87).

*Joseph B. & Bryan Cumming,* for defendant, cited: *Ga. R.* 61/114; 83/595; 93/370; 102/485; 123/485; 121/775, 777; 92/-88, 93; 101/400, 407-9; 102/485; 108/791; 78/694; 82/400, 667, 801; 108/306; 113/713; 102/285.

ATKINSON, J. 1. In view of the evidence in this case upon the question of frequent use of the railroad track at the particular place of the homicide, by pedestrians as a pathway, known to the defendant company, we think, as a question of fact, it should have been submitted to the jury to say whether or not the use was shown to exist to such an extent as to require those operating the cars of the defendant to anticipate the presence of persons on the track. If the evidence was such as to require them to anticipate the presence of pedestrians on the track, then they were bound to use ordinary care to avoid injury to any one who might be on the track at that place. To do this would depend upon the particular conditions surrounding each case; but, among others, the condition of the machinery, the condition of the track, the capacity for stopping within a given distance, and the capacity for discovering any one on the track within that distance, are matters which should be

taken into consideration and observed by the engineer in approaching a part of the track where, from the publicity and frequency of its use by pedestrians, he has reason to apprehend the presence of one. In *Atlanta Ry. Co.* v. *Gravitt, 93 Ga.* 369, this court held that, relatively to a person who, without license from the company, is walking upon a railroad track on a trestle, though such trestle be situated between a blow-post and a public crossing, the duty of the railway company to observe "all ordinary and reasonable care and diligence towards such person arises when his presence becomes known to the engineer, and not before." This is a broad statement, and an examination of the opinion will show that the court did not have in mind a place on the track so frequented by pedestrians as to afford reason for the engineer to anticipate their presence. The law would not be so lax with human life as to allow the operation of such dangerous machinery as a railroad train over such place with utter disregard. So afterwards, in the case of *Georgia R. Co.* v. *Cromer,* 106 *Ga.* 296, this court emphasized the duty of a railroad company to observe care with reference to one not on a public crossing, but at a place so frequented by the public as to give reason to anticipate their presence. In that case the court held: "Where a railroad crossing is in a populous locality and is much used by the public, but the same is not within the limits of an incorporated city or town and is not a part of a public road established pursuant to law, what rate of speed in approaching and running over such crossing would be negligence, and what signals ordinary care would require to be given, are matters to be determined by the jury according to the circumstances of each particular case." This case was referred to approvingly in *Bullard* v. *Southern Ry. Co.,* 116 *Ga.* 644, and there the court said: "Where a number of persons habitually, with the knowledge and without the disapproval of a railroad company, use a private passageway for the purpose of crossing the tracks of the company at a given point, the employees of the company in charge of one of its trains, who are aware of this custom, are bound, on a given occasion, to anticipate that persons may be upon the track at this point; and they are under a duty to take such precautions to prevent injury to such persons as would meet the requirements of ordinary care and diligence." While these cases refer particularly to localities where the custom was to cross, and not to go longitudinally along the track,

the principle is just the same. The ruling was put upon the duty which arose, not upon the technical ground that it was a public crossing, but upon the ground that because of the frequency of the use, the presence of pedestrians was to be anticipated. Therefore it was that in *Bullard's* case this court approvingly referred to *W. & A. R. Co.* v. *Meigs,* 74 *Ga.* 864, where it was said: "There was no error in admitting the testimony relating to the habit of the public in walking on the defendant's tracks at and near the place where this injury happened. While this habit, even if acquiesced in by the railroad company, did not prevent the deceased from being a trespasser, it was a circumstance which the jury might properly consider in determining whether or not the persons in charge of the train showed proper diligence at the time the killing occurred. Railroad engineers should observe more caution in running at places where they know persons are likely to be on the track than elsewhere, even if those persons are trespassers, and especially is this true when the company has at least tacitly consented to this otherwise unauthorized use of its property by the public." In *Bullard's* case this court also quotes approvingly from Hopkins, Pers. Inj. § 87, p. 142, as follows: "Where no permission is given, but there is a habit on the part of individuals or the public of traveling over the track on foot, and nothing is done to prevent it, that does not modify or change the legal rights or obligations of either the public or the company. By such use the public are not tacitly licensed to go upon the track and the consent of the company to the use is not implied; but the fact that they do go there enters into the situation as it is known to the company, and affects the caution and amount of care required in running the trains." The distinction already drawn between the case at bar and *Atlanta Ry. Co.* v. *Gravitt,* supra, was made in the well considered case of *Crawford* v. *Southern Ry. Co.,* 106 *Ga.* 873, where Mr. Justice Fish, after citing numerous authorities, evolved the following rule: "Taking the locality where the train is running and all the surrounding circumstances, if those in control of the movement of the train have no reason to apprehend that there may likely be a human being on the track in front of the engine, they are under no duty to one who may in fact be there, until they have actually discovered that he is there. But if, from the locality or surrounding circumstances, there is reason to appre-

hend that the track in front of the locomotive may not be clear of human beings, then, it seems to us, it is the duty of the employees of the company to keep a lookout ahead of the train; most assuredly so unless they are performing some duty which prevents their looking out upon the track in the direction in which the train is moving." This rule is approved in *Ashworth* v. *Southern Ry. Co.,* 116 *Ga.* 635, and *Bullard* v. *Southern Railway Co.,* supra. In *Southern Ry. Co.* v. *Chatman,* 124 *Ga.* 1026, Mr. Justice Lumpkin, after reviewing a number of cases, text-books, and other authorities on the duty of a railroad company to a trespasser, states the law thus: "The general rule, that as to a trespasser upon a railway track the duty of observing ordinary care and diligence for his protection does not devolve upon the company's·agents in charge of a train until his presence upon the track becomes known to them, does not relieve the company under all circumstances from anticipating the presence of a trespasser upon its track and from taking proper precautions to prevent injury to him. Where the circumstances are such that the employees of the company in charge of one of its trains are bound, on a given occasion, to anticipate that persons may be upon the track at a certain place, they are under a duty to take such precautions to prevent injury to such persons as would meet the requirements of ordinary care and diligence."

Assuming that the jury would have found that the place where the deceased was killed was so frequented by pedestrians as to afford reason for the engineer to anticipate their presence, what, then, did he do ·in the performance of his duty towards the deceased? There was evidence to the effect that the train was light, and, for that reason, not quick to stop. It was down grade and the track slick with dew. The speed was fifty miles an hour. From the evidence of the engineer it appears that he saw the deceased as soon as, under surrounding conditions, it was possible to do so. He gave the danger signal, immediately saw that the deceased was not responsive; immediately applied his brakes, and did all that was possible to stop before reaching the deceased. Although his engine and equipments were in perfect condition, it struck the deceased and passed 150 to 200 yards beyond, before it was possible to come to a stop. Can it be said that at this particular time and place and under these particular conditions, with reference to the deceased, the engineer was in the exercise of all ordinary and rea-

sonable care and diligence? Was he not, under those conditions, running at an unreasonable rate of speed, and was not his conduct in that respect negligence? These were questions for the jury, and it was erroneous for the court to charge: (1) "I charge you it is not lack of ordinary care and diligence to fail to keep a lookout for persons on the track not on a public crossing." (2) "I charge you, the duty to exercise all ordinary and reasonable care and diligence towards a person not on a public crossing arises when his presence becomes known to the employees in charge of the engine, and not before. A failure of such care and diligence after that time, and from which injury occurs, unless it could have been avoided by the use of ordinary care on the part of the person killed or injured, will render the company liable."

2. In the light of the evidence and the charge of the court taken as a whole, there was no such error in any of the other grounds of the motion for new trial as would justify this court in reversing the judgment of the court below.

*Judgment reversed. All the Justices concur, except Fish, C. J., and Beck, J., who dissent.*