**ATLANTIC COAST LINE RAILROAD COMPANY, Appellant,**

v.

**Mrs. Elizabeth Frances FUTCH, Appellee.**

**No. 17369.**

United States Court of Appeals
Fifth Circuit.

Dec. 30, 1958.

Rehearing Denied March 5, 1959.

Bernard J. Mayer, LaGrange, Ga., John A. Smith, Talbotton, Ga., Lovejoy & Mayer, LaGrange, Ga., of counsel, for appellant.

James H. Fort, Columbus, Ga., Robert H. Jordan, Talbotton, Ga., Al Williams, Columbus, Ga., for appellee.

Before RIVES, TUTTLE and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from a judgment based on a jury verdict in favor of a mother for the death of her 18 month old son on the track of the defendant railroad. The child was struck in the vicinity of a path leading from its parents' house[1] down to the tracks. The question, preserved for review by defendant's motions to dismiss, for a directed verdict, for judgment n.o.v. and for new trial, is whether there was any substantial evidence of negligence on the part of appellant or its employees which proximately caused the death of the child. The family lived in a railroad-owned house across the track from the public depot of Junction City, Georgia, a town of 259 people according to the 1950 census. The mother had gone shopping for groceries, leaving three small children in the father's care. The father was repairing a puncture in an automobile tire. He heard the train blow for a public road crossing near the depot[2] and then discovered that the baby was missing:

"Q. And where was Randy right at that time? A. Well, when the train blowed I looked around and didn't see him, and I run to the front door and he was in the middle of the track.

"Q. Go ahead and tell us what you did? A. And, er, so er, he turned and come out and got across the rail. I run as hard as I could and I got near about in, I would say, eight or ten feet of him before the train struck him."

It is not seriously argued by appellee that either the fireman or engineer was negligent as to anything they did or failed to do after seeing that there was a child on the tracks.[3]

1. The father was a section foreman for the appellant railroad.

2. The locomotive crossed the public road 322 feet before striking the child.

3. The fireman's story of what happened follows:
"A. Well, I was looking out the side window to watch for the train order board. They have a board there they call the train order board. The sun was shining bright and I was looking out for this train order board, and I saw it in the clear position. I called the position of the board to the crew inside, that we had a clear board, there was something in that area that caught my attention. Well, the sun being bright and everything, I couldn't tell just what it might be. I come back on the inside of the locomotive and stood up and got into the shaded area where I could look thru the glass in the door. I still couldn't make out just exactly what it was, and all of a sudden this, er, a child, or at least the object raised up. Now whether it was sitting down or whether it was just bending over I couldn't say, but it raised up and I recognized it as a child. I yelled to the engineer to big hole it. That means to put the brakes in emergency, and he put the brakes in emergency immediately. Well, I tried to open the door and the speed that we were going and the force of the wind as I opened the door blew my cap off. Well, that distracted my attention enough that the door slammed shut and it come back past the point where the latch would go into the hasp there, or at least I imagine you would call it a hasp, you know, but anyhow it was forced beyond that point, and I had to bump the door several times before I could force it open, and I tried to get out to the front of the engine there, thinking that I might could shove the child off of the track if I could get out to the front of the locomotive, but this

After the brakes were already in emergency, the engineer saw the child astride the right hand rail. The child was knocked some sixty feet and his body came to rest on the right hand side of the track.

The engineer upon receiving the alarm threw the brakes in emergency and testified that he made a remarkable stop. Even that, however, consumed a distance of forty car lengths, or 1600 to 1800 feet. The brakes had been applied only about 350 feet from the child. According to the engineer and the fireman, the speed of the train before braking was forty-five miles per hour. Even if the train had been traveling only fifteen miles per hour, the evidence showed that it could not have been stopped before reaching the child.

The district court charged the jury in part as follows:

" * * * Where persons habitually, with the knowledge and without the disapproval of the railroad company, use a private passage way for the purpose of crossing the tracks of the company at a given point, the employees of the company in charge of one of its trains who are aware of the custom are bound on given oc-casions to anticipate that persons may be upon the tracks at this point, and they are under a duty to take such precautions to prevent injury to such persons as would meet the requirements of ordinary care and diligence."

After having deliberated for two hours, the jury returned to the box and its foreman stated to the court:

" * * * The jury is not clear in regard to your charge of the law about the path in front of the section foreman's house being used by the public. That seems to be the trouble right now."

The court then repeated a portion of its charge, including the part heretofore quoted. Thereafter the jury reached its verdict in favor of the plaintiff.

The part of the court's charge which has been quoted is in the language of the Supreme Court of Georgia in Western & Atlantic R. Co. v. Michael, 1932, 175 Ga. 1, 165 S.E. 37, 41, quoted in Bridges v. Southern Railway Co., 1957, 96 Ga.App. 497, 100 S.E.2d 619, 620. The rule thus stated imposes a duty to anticipate persons upon the track only upon "the employees of the company in charge of one of its trains, *who are*

---

child was at the left hand rail whenever I first saw it. It crossed over to the right hand rail. I was thinking maybe I could get out there and maybe shove it off, and in the process I only made it about half way down whenever the child went out of my sight on the right hand side.

 * * * * *

"A. At the time I first saw it we were rounding the curve and the sun was back off to the left. I was trying to shade my eyes so I could see, but then as we rounded the curve the sun was shining completely, almost directly, straight. We was headed almost directly right straight into the sun.

 * * * * *

"A. After—when—after the child was spotted, the child crossed over to the right hand rail, stepped across the rail, by putting both hands down on the rail and stepping over one foot at the time.

 * * * * *

"Q. Well, there was another hazard too, and that was the bright sun shining in the engineer's eyes, in your eyes too, wasn't it? A. Yes, sir.

 * * * *

"A. Well, at the time I saw it now, I couldn't say whether it was sitting down or bending over, and I didn't actually recognize it as a child until it straightened up, stood up.

"Q. And that, you say, was only a few seconds? A. That was only a few seconds. I yelled 'big hole it,' there's a child on the track,' and then it started moving from the left hand rail to the right hand rail. To cross over this rail it put both hands on the rail, put one foot over and it looked back over its shoulder, and then put the other foot over, and all this time I was—I had my eye on this child, trying to get out to the front. I made it half way down there and the child went out of my sight on the right hand side of the locomotive. I never did see it straighten up at all."

*aware of the custom."* (Emphasis supplied.) That point was emphasized in Bridges v. Southern Railway Co., supra, 100 S.E.2d at page 621, as follows:

"Where the agents of a railroad engaged in the operation of its train have no knowledge of a *crossing* which is not a public crossing, or a private crossing established by law, or a crossing which the railroad keeps up or helps to keep up, but which is commonly used by the public without the express disapproval of the railroad, the only duty owed a trespasser upon or near the tracks at such point is not to wilfully or wantonly injure him after his presence is actually discovered. Vaughn v. Louisville & N. R. Co., 53 Ga.App. 135(4), 185 S.E. 145."

The parties stipulated to the correctness of a diagram that was introduced by agreement. This diagram, or plat, showed the spot where the child was hit as being some distance from the point at which the path, if projected, would cross the track. It was at least 12 to 15 feet down track from such point.[4] The significance of this fact is that the plaintiff's house, in which the child lived, fronted for some fifty feet along the railroad right-of-way. The yard was not separated from the track by any steep slope, hedge, fence or ditch. The photographs clearly show that easy access could be had to the tracks from any part of the yard. There is no evidence that the child entered the railroad right-of-way at the path rather than at some other point where the yard abutted the track. This situation was in all respects similar to any house abutting the railroad tracks where either child or grown person could step from his front yard onto the track at will. The only difference here is that there was this private path.

This path is seen by the plat and dimly on one photograph to lead into appellee's yard and directly to the front porch of the house. It was thus wholly on private property and was no extension of a public way. Anyone crossing the tracks to or from the path would necessarily leave or enter it in appellee's front yard immediately at her front steps.

Inasmuch as the locomotive blew the required crossing whistle for the little community's road crossing, it is not contended that the railroad was negligent in respect of any obligation of care it owed to persons who might have been on the tracks at or about the station or at or about the crossing. It is only the duty of the railroad arising from the likelihood of persons using this private path that the trial court felt warranted sending the case to the jury.

The testimony on the use of the path was vague as to the frequency of use during the time when notice must be brought home to the railroad company and the operators of the trains. Although one witness testified that in the forty-two years he had lived in the community he had used it "thousands of times," (if he used it once every other day for thirty years this would amount to five thousand times) he said only that he had used it "on several occasions" in the "last three or four years."

The plaintiff introduced no direct evidence of knowledge of the private crossing by any member of the railroad crew in charge of the operation of the train. There was evidence given by several local residents in addition to the section foreman's family that they had crossed the tracks at this place with some frequency. There was no witness who ever testified to being on or about the path or crossing or seeing others there when any train or locomotive of the appellant

4. The inconsistent testimony of Mr. Futch as to the place where the child was hit (he testified at one place that the plat was correct, at another that he would say the child was "right in" the path; in identifying photographs, he placed the spot in two still somewhat different places) cannot be considered by the jury as fixing the point of the accident somewhere other than agreed to by the *parties* themselves. The agreement of counsel in open court that the plat was correct resolves this issue.

railroad was passing. There is thus no proof that what usage occurred was ever brought to the attention of the operators of this or any other train. The crew all testified they had no knowledge that anyone used this path as part of a crossing. The engineer, fireman and brakeman all testified they had never seen any person on or about the path. The engineer, who had been on the run off and on for 12 years, said of the path: "I didn't know whether it was a path or not. I had noticed a little streak down there, but I hadn't noticed that it was a path. I hadn't never seen anyone going back and forth on it."

Of course, where there is proof of circumstances which would permit an inference that the operating crew of the train knew of habitual use of a passageway or crossing, and where there was no categorical undisputed testimony to the contrary a jury question may arise as to whether the operator did in fact know of the habitual crossing. Such cases are Macon & Birmingham Railway Co. v. Parker, 127 Ga. 471, 56 S.E. 616, and Shaw v. Georgia R. R., 127 Ga. 8, 55 S.E. 960. Such was not the case here. Assuming that the testimony of use here established such a "habitual" use or "common" use as is referred to in the Western & Atlantic and the Shaw cases, supra, and that such use had come to the knowledge of the railroad company, as was the state of the proof in the Shaw case, there is no evidence that any use was ever observed by, or in any way brought to, the attention of the crew of this train, so as to draw in issue their categorical statements that they knew of no such use. There was, therefore, no jury issue on this essential point. The Georgia law, even with the heavy duty of care it places on a railroad, as

expressed in the court's charge,[5] still requires that knowledge of the public use of a private crossing *by the operators of the train* exist before the duty to anticipate the peril arises. Bridges v. Southern Railway Co. supra.

There being no evidence from which the jury could have found that the "employees of the company in charge of * * * its train" had any knowledge that persons "habitually used [the] private passageway for the purpose of crossing the tracks," the defendant's motion for directed verdict at the close of the case should have been granted.

The judgment is reversed and judgment rendered for the defendant.

RIVES, Circuit Judge (dissenting).

Respectfully, but as earnestly as lies within me, I dissent. My brothers say that the child was struck "in the vicinity of a path * * *"; that "this diagram, or plat, showed the spot where the child was hit as being some distance from the point at which the path, if projected, would cross the track. It was at least 12 to 15 feet down track from such point"; that "there is no evidence that the child entered the railroad right-of-way at the path rather than at some other point where the yard abutted the track." In those statements, with their supporting footnote and niceties of measurement, my brothers take a position in favor of the appellant which it did not itself take in the testimony of its witnesses upon the trial, and for which it did not there contend and does not contend on this appeal. As I read the record, there has never been any disputed issue that, *if there was a path,* the child was in it. With deference, I do not think that the diagram or the photographs sent up as original exhibits support the con-

5. As an example of a less heavy burden of care as required by the law of Pennsylvania, see Sabo v. Reading Co., 3 Cir., 244 F.2d 692, at page 694, where it is said:

"A railroad has the paramount right of way and is entitled to * * * act upon the presumption that, there will be no trespassers on the tracks. * * * To

hold otherwise would defeat the social and economic utility of railroads. In the present case, the train would have had to be traveling no more than ten miles an hour to have stopped within the distance of visibility, thus completely defeating its purpose as a transportation medium."

706

struction which my brothers place on them, but assuming that they do, such a construction should not influence the disposition of this appeal. That is because of the well-established principle expressly recognized by the appellant in its brief (p. 5) that " * * * we concede that the evidence must be considered in its most favorable aspect to the plaintiff, with every fair and reasonable inference which the evidence justifies." The only witness who was in position to judge the child's exact location with respect to the path was the child's father, who, in a desperate effort to rescue his son, had reached a point "eight or ten feet of him before the train struck him." He testified:

"Q. How far was the child off of that path when it was hit, that is if the path had been projected right on over the railroad? A. Well, I would say he was right in it." (Record p. 51.)

The jury was the fact-finding body, and it had a right to believe this testimony, and especially so, since neither of the other eye witnesses testified to the contrary.[a]

The existence of the path was denied by the Railroad, but the evidence is all one way. Indeed, the Railroad's attorney himself stated, "I admit that there's something there which you can call a path if you want to call it one." (Record p. 59.)

There was no conflict in the testimony as to the habitual use of the path by members of the public. Ten witnesses so testified. I refer briefly to the testimony of five of them. Mr. Futch testified that his family and people living in the houses back of him had used the path across the track from as far back as 1942. Mrs. O. C. Dorsey testified that she had known of this crossing for the time she had been in Junction City, about twenty years. Mr. Matthew Webster testified that he and his family had used it since 1925. Mr. Robert L. Hollis, thirty-six years old, had lived in Junction City all of his life and testified that the crossing had been there ever since he could remember. Mr. M. J. Hester, the Mayor of Junction City, had lived there all of his life, forty-two years, and testified that he had crossed the railroad tracks at that point "thousands of times," and that members of his family crossed there.

Of course, there was no direct evidence of knowledge of the private crossing by members of the railroad crew in charge of the operation of the train. Rarely, if ever, can such direct evidence be available, unless the plaintiff is so fortunate as to obtain admissions from the Railroad's employees. Unexpectedly, in this case, there were admissions, carefully guarded it is true, on the part of the locomotive engineer of knowledge of "a little streak down there," and on the part of the brakeman of knowledge of "a trail or something there."[1]

It is a strange rule which permits the Railroad to let the members of its crew in charge of the operation of a train remain ignorant of a condition involving

---

a In the face of such uncontradicted testimony, I feel sure that the plaintiff's attorneys did not intend to stipulate their client out of court.

1. Engineer Phiel testified:
"Q. You knew of the path to the section foreman's house, didn't you? A. Well, I didn't know whether it was a path or not. I had noticed a little streak down there, but I hadn't noticed that it was a path. I hadn't never seen anyone going back and forth on it."
Brakeman Melvin testified:
"Q. Mr. Melvin, did you know of the existence of this path down from the sec-

tion house which led on over towards the station? A. No, sir.
"Q. Had you ever noticed it? A. I have never noticed there being a public path there.
"Q. Well, whether you call it public or not, have you ever noticed it? A. Well, I noticed looked like a trail or something there, but whether it was a path I don't know.
"Q. In the time that you had been over there you had seen people about that area, hadn't you? A. The times I've been by there, the times I've stopped there I've never saw anybody cross that place."

danger to members of the public, necessarily known to other employees and to the Railroad itself. Knowledge should be imputed to members of the crew. Of course, knowledge on the part of the train crew could be proved by circumstances. As said in 20 Am.Jur., Evidence, Sec. 272, p. 260: "In many instances facts can be proved only by circumstantial evidence. Such evidence is usually the only means of proving intent, knowledge, * * *."

The Supreme Court of Georgia, speaking in Shaw v. Georgia R. R., 1906, 127 Ga. 8, 55 S.E. 960, 961, 962, said:

"In view of the evidence in this case upon the question of frequent use of the railroad track, at the particular place of the homicide, by pedestrians as a pathway, known to the defendant company, we think, as a question of fact, it should have been submitted to the jury to say whether or not the use was shown to exist to such an extent as to require those operating the cars of the defendant to anticipate the presence of persons on the track. If the evidence was such as to require them to anticipate the presence of pedestrians on the track, then they were bound to use ordinary care to avoid injury to any one who might be on the track at that place. To do this would depend upon the particular conditions surrounding each case, but, among others, the condition of the machinery, the condition of the track, the capacity for stopping within a given distance, and the capacity for discovering any one on the track within that distance, are matters which should be taken into consideration and observed by the engineer in approaching a part of the track where, from the publicity and frequency of its use by pedestrians, he has reason to apprehend the presence of one * * *. 'Where the circumstances are such that the employés of the company in charge of one of its trains are bound, on a given occasion, to anticipate that persons may be upon the track at a certain place, they are under a duty to take such precautions to prevent injury to such persons as would meet the requirements of ordinary care and diligence.' "

In Macon & B. Ry. Co. v. Parker, 1907, 127 Ga. 471, 56 S.E. 616, 617, the Georgia Supreme Court reiterated:

" * * * In Shaw's Case, supra [55 S.E. 960], it was expressly ruled that the question as to whether there was such use by pedestrians, and whether the use was of such character as to put the defendant and those operating its trains upon notice and require them to anticipate the probable presence of pedestrians at that particular place, were questions of fact for determination by the jury. * * * "

In an earlier private path case, Bullard v. Southern Ry. Co., 1902, 116 Ga. 644, 43 S.E. 39, 41, it had been said:

" * * * It was for the jury, and not for the court, to say what was the measure of its duty under all the circumstances of the case. * * * "

Under the evidence in this case, even if the Georgia decisions did not so clearly make the Railroad's duty and its breach questions for the jury, I would still say that they were such under the Seventh Amendment to the Constitution of the United States and under the federal decisions. Of course, the Seventh Amendment applies to diversity cases, the same as to others tried in federal courts. Wright v. Paramount-Richards Theatres, 5 Cir., 1952, 198 F.2d 303, 305; Reuter v. Eastern Air Lines, 5 Cir., 1955, 226 F.2d 443, 445. The Supreme Court recently spoke in a diversity case as follows:

" * * * The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial

functions between judge and jury and, under the influence—if not the command—of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury. Jacob v. City of New York, 315 U.S. 752 [62 S.Ct. 854, 86 L.Ed. 1166]."

Byrd v. Blue Ridge Cooperative, 1958, 356 U.S. 525, 537, 78 S.Ct. 893, 901, 2 L. Ed.2d 953. Two per curiam reversals of our Fifth Circuit within the past few years have, in effect, admonished us that verdicts in diversity cases are protected by the Seventh Amendment.[2] Nevertheless, with deference, I submit that the present decision makes it obvious that we have not yet learned that lesson.

The evidence was amply sufficient from which the jury could have found negligence, even gross negligence, on the part of the Railroad crew. The child was easily observable, dressed as he was in a diaper and a bright red and white shirt. When the father first saw him after the train blew, the child was standing up in the middle of the track facing away from the house.

"A. Yes, sir, and then he turned to come back.

"Q. Was he standing up? A. Yes, sir, and he walked back to the rail and he put his little hand on the rail and stepped over on the head of the tie."

The train was a local freight which originated at Fitzgerald and was destined for Manchester, Georgia. It was not running on any strict time schedule, but could pass through Junction City at any time from 11:30 in the morning to 9:00 at night (Record pp. 38, 51). It consisted of two diesel unit locomotives, twenty-four freight cars, and a caboose. Six of the cars were empty, three were loaded with scrap iron, one was loaded with feed, and fourteen had been picked up at Brown Sands, two miles south of Junction City, loaded with sand. The extra diesel locomotive had been picked up at Oglethorpe for the purpose of handling the heavy load of sand. The approximate total tonnage, according to the conductor, was 1495 tons.

The train approached Junction City traveling in a northwesterly direction on a five degree curve to the left. This curve continues until it reaches a point 361 feet south of the station. The grade for about a mile approaching Junction City is a one per cent downgrade, and the last 1424 feet from the scene of the accident is a seventy-seven one-hundredths per cent downgrade. The locomotive had crossed the public road only 322 feet before it struck the child.

The engineer was seated on the right hand side and the fireman on the left hand side of the lead diesel locomotive, both seats being about 10 or 12 feet back from the front of the locomotive. The accident occurred at about 6:18 P.M. on May 14, 1957. The sun was shining brightly directly into the cab but at a changing angle as the locomotive rounded the curve. According both to the fireman and to the engineer the sun interfered with their vision to some extent.

No necessity was shown for a local freight train so heavily loaded, traveling downgrade, around a curve, into the bright afternoon sun, within two miles after taking on the heaviest part of its load, to gather a speed of forty-five miles per hour when passing through a community where pedestrians might be expected, so that it could not be brought to an emergency stop within a distance of more than a third of a mile.

Evidently implying that the excessive speed was not the proximate cause of the child's death, my brothers say: "Even if the train had been traveling only fifteen miles per hour, the evidence showed that

---

**2.** Swafford v. Atlantic Coast Line Railroad Co., 1955, 350 U.S. 807, 76 S.Ct. 80, 100 L.Ed. 725, reversing 5 Cir., 220 F.2d 901, a railroad grade crossing case, and Gibson v. Phillips Petroleum Co., 1956, 352 U.S. 874, 77 S.Ct. 16, 1 L.Ed.2d 77, reversing 5 Cir., 232 F.2d 13; see Protection of Jury Trial—Diversity Cases, by Dean Leon Green, 35 Texas Law Review 768.

it could not have been stopped before reaching the child." They overlook at this point three other simultaneous movements: (1) the child, young as it was, was moving toward a place of safety; (2) the fireman was trying to get out to the front of the engine to shove the child off of the track; (3) the father was racing toward his child and was within "eight or ten feet of him before the train struck him." If the train had been traveling fifteen miles per hour, one or more of those three movements would probably have saved the child's life. Certainly, it was open to the jury so to find.

I agree with the district court that it was for the jury to say whether the employees in charge of the operation of the train should have anticipated the probable presence of a person or persons on the track at the point where the path crossed and whether they were negligent, under all of the facts and circumstances of this case, in running the train through Junction City at a speed of forty-five miles per hour.

I think that the judgment should be affirmed.

### On Motion for Rehearing

TUTTLE, Circuit Judge.

In her motion for rehearing appellee states that we have incorrectly assessed the effect of the stipulated plat or diagram of the scene of the accident. She asserts that the plat was not intended to show the precise point where the child was struck; rather, it is said, the plat was introduced to show other measurements. Since the measurements shown on the plat have significance only as they relate to the place of the accident, it is difficult to understand how the parties could not have intended to agree as to that spot as well as the other dimensions shown. Nevertheless, since counsel, and Judge RIVES in his dissenting opinion, feel that the majority has drawn improper conclusions from the stipulated plat, we now state what might have been preferable in the first instance:

 Under the law as announced by the Georgia courts, as shown by the cases cited in the opinion, it makes no difference whether the child wandered onto the track from the pathway or from some other place where his front yard abuts the tracks. There can be no recovery here because there is no evidence of negligence on the part of the defendant railroad.

The petition for rehearing is denied.

RIVES, Circuit Judge, dissents.